SHEPLERS, INC., Plaintiff,

v.

**KABUTO INTERNATIONAL (NEVADA) CORPORATION, Defendant.**

No. Civ.A. 98–2131–GTV.

United States District Court, D. Kansas.

Aug. 6, 1999.

---

Todd W. Ruskamp, Joseph G. Matye, Paula Hicks Schaefer, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Sheplers Inc, a Kansas City Corporation, plaintiff.

Gordon D. Gee, Susan S. Goldammer, Seigfreid, Bingham, Levy, Selzer & Gee, Kansas City, MO, for Kubuto International (Neveda) Corporation, defendant.

## MEMORANDUM AND ORDER

VanBEBBER, District Judge.

Plaintiff Sheplers, Inc. brings this diversity action against defendant Kabuto International (Nevada) Corporation, seeking a declaratory judgment and an accounting under a lease between the parties. The lease dispute revolves around a lease provision which allows defendant, the landlord, to charge tenants for their proportionate share of the common area maintenance costs. The case came before the court for a bench trial on April 29 and 30, 1999. Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### I. Findings of Fact

#### A. General Facts

On August 4, 1992, plaintiff, as tenant, and defendant, as landlord, entered a lease for commercial retail space in the Pecos–Tropicana Centre ("the Pecos Centre") in Las Vegas, Nevada. The lease commenced November 1, 1992. The lease ended October 31, 1997, unless plaintiff exercised its option to extend the lease for an additional term of five years. The lease provided that plaintiff could exercise its option three times, fully extending the lease to October 31, 2012. On April 29, 1997, plaintiff exercised its first option to extend the lease for a second five-year term from November 1, 1997 to October 31, 2002.

The parties' dispute concerns whether certain costs were properly chargeable to plaintiff as common area maintenance (CAM) under the lease. Paragraph 3.9 of the lease provides that "common area expenses" include:

the operating, managing, equipping, lighting, repairing, replacing, and maintaining the common areas, specifically including landscaping and gardening, parking lot, line painting, lighting, traffic control, if any, sanitary control, removal of snow, trash, rubbish and garbage and other refuse, liability insurance premiums for the common areas, cost of all rentals of machinery equipment in such maintenance, the cost of personnel to implement such services to direct parking and to police the common areas. [CAM] shall specifically exclude all costs associated with the leasing activity in the shopping center and all capital expenditures.

Paragraph 1.3(b) defines "common areas" to include:

parking areas, those items described in Article 10.1 below, service roads, sidewalks and other areas constructed or to be constructed for use in common by the tenant with the other tenants in the shopping center and their employees and business invitees, subject, however, to the terms of this agreement and reasonable rules and regulations prescribed from time to time by the Landlord.

Paragraph 10.1 states that:

All parking areas, driveways, entrances and exits thereto, sidewalks, ramps, landscaped areas, exterior stairways, and all other common areas and facilities provided by Landlord for the common use of tenants of the shopping center and their officers, agents, employees and customers, shall at all times be subject to the exclusive control and management of Landlord, ... Landlord shall have the right and obligation to operate and maintain the same in such manner as Landlord, in its reasonable discretion, shall determine from time to time, including without limitation the right to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of said common areas.

Under the terms of the lease, plaintiff must prepay a monthly estimate of its share of the CAM expenses of the Pecos Centre, which is determined by defendant based on the previous year's CAM expenses. Plaintiff's portion of the expenses is based on the ratio of the total gross square footage of the plaintiff's leased premises to the total square footage of all of the gross leasable space in the Pecos Centre. The parties agree that plaintiff's proportionate share is 4.0828%.

Defendant is required to submit to plaintiff a statement of actual CAM charges within forty-five days after the end of the lease year. The lease provides that the statement must be "in such form and style and shall contain such detail and breakdown as the Tenant may reasonably require." Within ten days of receipt of the CAM statement, plaintiff must ·pay any remaining balance for the previous year, or defendant must credit any overpayment to plaintiff's next payment due. The lease allows plaintiff to audit the CAM expenses and to recover the costs of the audit if it discloses an error of greater than three percent in the CAM fee for the period.

### B. Off–Site Management Fee

Defendant employs KSK Property Management as its agent and property manager at the Pecos Centre and other properties. KSK's primary office is located in San Francisco, California. KSK manages only properties owned by defendant, and is, in fact, under the same ownership.

The contract between KSK and defendant requires KSK to collect rent and other income due to defendant, pay from collected funds the cost of operating, maintaining, and repairing the property, institute legal actions regarding the property, maintain accounting books and files

containing rent records, insurance policies, leases, correspondence, receipted bills and vouchers, and all other documents pertaining to the property or the operation thereof, provide defendant with all notices affecting the property, take actions necessary to comply with orders or violations effecting the property, furnish defendant with a monthly statement of rent and income collected, pay to defendant gross receipts, provide management services customarily provided by management agents in the locality of the property, assume responsibility for the proper deposit and application of funds, comply with mortgage requirements, prepare a yearly budget and management plan, and to produce various periodic reports for defendant. KSK performs all of the duties under the contract.

The KSK employees in San Francisco offering services for the Pecos Centre include Peter Widney, Senior Vice President of Property & Asset Management, and accounting personnel. Widney negotiates leases with tenants and supervises and assists the on-site property manager in the property manager's duties. In 1996, defendant began charging plaintiff for the costs of KSK's off-site management of the Pecos Centre. Defendant did not charge plaintiff for such costs under the lease in 1992, 1993, 1994, or 1995. In 1996 and 1997, defendant's CAM expenses attributable to off-site management were $204,-221.00 and $198,722.00, respectively. The off-site management fee is calculated according to the contract between defendant and KSK, which provides that defendant to pay to KSK a fee for management services of four percent of gross rental receipts.

### C. On–Site Management Expenses

Defendant began charging plaintiff for on-site management fees in 1995. Defendant did not charge plaintiff for on-site management fees under the lease in 1992, 1993, or 1994. In 1995, 1996, and 1997, the components of the on-site management fees varied. In 1995, the fee consisted only of the salaries, benefits, and workers' compensation insurance for the on-site property manager and the manager's assistant. The total fee in 1995 was $68,-839.00. In 1996, the fee included the above compensation for the two on-site employees in the amount of $74,237.47 plus office administrative expenses of $9,426.21. The total on-site management fee in 1996 was $83,663.68. In 1997, the fee included the on-site employees' compensation ($78,-032.75), office supplies ($2,695.44), office telephone ($3,150.29), office gas and electric ($124.81), office copier and fax services ($948.86), office postage and delivery ($2,103.74), the rent for the management office ($21,616.41), licenses, fees, and taxes ($440.00), workers' compensation ($2,376.94), and an automobile allowance ($4,800.00). The total fee in 1997 was $116,289.24.

Defendant provided no documentation distinguishing between the property manager's compensation and the assistant's compensation. Nor does the documentation provide any breakdown of the time spent on issues related to CAM or on tenant-specific issues. The property manager supervises the maintenance staff, contract employees, and the administrative assistant, discusses leasing, subleasing and assumption of leases with tenants and forwards information to the San Francisco office, coordinates lease signings, responds to tenant questions regarding tenant improvements, works with tenants to approve blueprints and plans, attends to other needs of defendant's tenants, purchases supplies for the property, receives and deposits rent checks, forwards payment information to the San Francisco office, prepares various reports, contracts with various vendors including plumbers, electricians, security guards, and trash collectors, assists in litigation, enforces and administers the terms of all tenant leases, performs fiscal and accounting functions, maintains the management office and purchases supplies for the office, prepares and discusses the op-

erating expense adjustment, and maintains contact with the San Francisco office regarding accounting and operations in Las Vegas. Despite this list of mostly non-CAM duties, the property manager, Christine Lovering, testified that everything that she does relates to CAM, and that she spends only approximately one hour per month on tenant-specific matters. Defendant provided no documentation for the job duties performed by the property manager's assistant. At trial, the property manager testified regarding the secretarial functions that the assistant performed, including coordinating lease signings. The assistant spends time on tenant-specific matters such as visiting each of the sixty tenants every month, but Lovering testified that the task of going to and visiting with each of the sixty tenants that occupy the 570,000 square feet of leasable space takes only four hours per month of the assistant's time.

The on-site property manager and her assistant also perform the same managerial duties at the Sahara Retail Centre, a small property separate from the Pecos Centre. The property manager and her assistant use the office at the Pecos Centre for work related to the Sahara Centre and neither receive a separate salary or automobile allowance for management of the Sahara property. Nevertheless, the entire office expense, salary, and automobile allowance is charged to tenants of the Pecos Centre as CAM expenses. Lovering testified that she spends only two hours per month on work related to the Sahara Centre.

The office administrative expenses charged to CAM in 1996 were not divided into categories of expenses, nor between CAM and non-CAM expenses. The 1997 office expenses were categorized, but none of these expenses were divided between CAM and non-CAM expenses.

In 1997, defendant charged to plaintiff the cost of leasing the property manager's office and of utilities for the office. Defendant has not provided to plaintiff a copy of the lease for the office space nor any other documentation establishing the rent charged. The office is used for both the Pecos Centre and the Sahara Centre management. The office supplies, copier and fax services, and postage and delivery charges for the on-site management office are allocated entirely to CAM. The supply purchasing expense includes supplies for the Sahara Centre. Defendant has failed to provide documentation regarding the use of these materials for CAM or non-CAM purposes.

Beginning in 1996, defendant charged an automobile allowance of $400 per month to CAM.[1] The property manager receives the monthly allowance as part of her paycheck pursuant to her employment contract. The manager does not record the use of her automobile between the properties or the purposes for the use at each property. In 1995, the previous property manager kept a record of mileage use for his automobile. Although plaintiff was not charged for that automobile use, that evidence indicates that such records could have been kept in subsequent years when the automobile lease expense was charged to plaintiff. The previous manager's allocation in January 1996 included only 13.79% attributable to on-site use. Other uses included leasing (44.97%), Sahara (28.23%), and miscellaneous (13.02%). The on-site use did not specify which portion was CAM-related. The allocation for on-site vehicle use was approximately the same amount throughout 1995.

The property manager testified that she allocated the entire telephone expense to the CAM. Defendant has failed to provide documentation to plaintiff regarding the telephone expense breakdown. Prior telephone records maintained by the previous

1. In 1996, defendant included an automobile allowance for ten months, totaling $4000.00, under general repair expense. In 1997, the automobile allowance was charged under the management expenses category.

manager indicated that the telephone was used seventy-percent of the time for leasing and thirty percent of the time for general office use, with no indication of whether the general office use was for CAM or non-CAM purposes.

*D. Other CAM Charges*

In 1996, defendant charged the entire cost of the manager's cellular phone ($265.00) and the maintenance workers' cellular phones ($1,336.00) to CAM. Defendant also billed the entire cost of a cellular phone used by a contractor ($223.12) in 1997 to CAM. Defendant has failed to provide any documentation regarding the use of the phones for common area and for other work. In 1996, defendant charged plaintiff and other tenants $2,402.00 for the cost of a security alarm line that runs through tenant suites and warns all tenants of a fire in the Pecos Centre, and $360.00 for security services for the property manager's office. In 1997, defendant charged to CAM the costs for a cleaning contract and other related bills in the amount of $52,821.97. The invoices provided by defendant refer to services performed pursuant to a cleaning contract, but defendant failed to provide the cleaning contract. Moreover, with a few exceptions, defendant has failed to provide to plaintiff any documentation indicating that the services related to the common area. Lovering testified that all of the cleaning expenses were for the common area. In prior years, however, the janitorial services/maintenance and cleaning charge was approximately $50,000 less than in 1997.

In 1997, defendant charged plaintiff $8,963.88 for trash service. Defendant charged plaintiff approximately 14.61% of the total cost of trash service for 1997, which was $61,349.32. Defendant based this charge on the proportion of leasable space among the tenants who actually used the service. In prior years, plaintiff paid its allocable share of 4.0828% for trash services. Defendant contends that the trash service is not covered by the CAM provisions of the lease, but that trash service is tenant-specific and must be charged only to the tenants that use the trash service. Defendant's actions belie its contention. Defendant included the cost of the trash service as part of the CAM expense on the Operating Expense Adjustment Invoice in 1997. The first notice of this was received by plaintiff in October 1998 when it received its 1997 expense statement. The lease between plaintiff and defendant does not address trash services except in paragraph 3.9 which includes trash removal as a common area expense. Plaintiff contends that it cannot be charged beyond its proportionate share based on the leasable space for the trash service.

Defendant billed plaintiff for legal fees in 1997 under the heading Repair and Maintenance–CAM in the amount of $5,188.34. Defendant has failed to provide documentation to show that these legal fees relate to or benefit the common area. Lovering, however, testified that these expenses were related to CAM.

In 1996 and 1997, defendant charged as CAM expenses various repair and maintenance costs that plaintiff disputes. In 1996, the defendant charged $2,026.62 for work done by Young Electric related to a lease agreement. The documentation of these expenses referenced a lease agreement only. No evidence established that the expenses were related to CAM. In 1997, defendant charged as CAM expenses a bill from Abraham Mechanical Services in the amount of $250.00, and a bill from Lamb Maintenance in the amount of $450.00. The Abraham bill was related to a gas line replacement and was marked as "insurance proceeds." The Lamb bill was marked "charge back to tenant-Swiss Cafe." No evidence indicates that these expenses were related to CAM. Defendant also charged as CAM expenses two legal bills dated November and December 1997, totaling $996.97. The November bill was marked "CAM—Parking Lot Repairs" and

the December bill was marked "Parking Lot Repairs."

## II. Conclusions of Law

■ This case involves interpretation of a lease provision. Plaintiff asserts that Kansas law governs the substantive issues in this case. In determining which state's substantive law governs a dispute, a federal court, sitting in diversity must apply the substantive law of the forum state. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Kansas law, the law of the place where the contract was made governs the contract's interpretation. *Rigby v. Clinical Reference Lab., Inc.,* 995 F.Supp. 1217, 1222 (D.Kan.1998). "A contract is made at the time the last act necessary for its formation is done, and at the place where that final act is done." *Smith v. McBride & Dehmer Constr. Co.,* 216 Kan. 76, 530 P.2d 1222, 1224 (1975). Here, plaintiff asserts that the last act necessary to complete the contract took place on August 4, 1992 when Sheplers' executive John Mosley signed the Lease in his Kansas office. Defendant does not dispute that Kansas law applies and cites Kansas law in its proposed Conclusions of Law. Accordingly, the court will apply Kansas law.

■ The primary rule when interpreting a written contract is to ascertain the intent of the parties. *Marquis v. State Farm Fire and Cas. Co.,* 265 Kan. 317, 961 P.2d 1213, 1219 (1998). Unless the contract is ambiguous, both the intention of the parties and the meaning of the contract must be determined exclusively from the instrument itself. *Rigby,* 995 F.Supp. at 1226. A contract is ambiguous only when the words used to express the meaning and intent of the parties are "insufficient in the sense the contract may be understood to reach two or more possible meanings." *Marquis,* 961 P.2d at 1219. That the parties differ as to what an unambiguous contract requires does not require that this Court declare the contract ambiguous. *Ryco Packaging Corp. v. Chapelle Int'l Ltd.,* 23 Kan.App.2d 30, 926 P.2d 669, 674 (1997). The court finds that the Lease provision at issue is unambiguous. Accordingly, the court must construe the intention of the parties solely from the contract itself.

■ "[M]eaning should be ascertained by examining the documents from all corners and by considering all of the pertinent provisions, rather than by critical analysis of a single isolated provision." *Akandas, Inc. v. Klippel,* 250 Kan. 458, 827 P.2d 37, 44 (1992). An unambiguous contract must be enforced according to its plain, general, and common meaning in order to ensure that the parties' intentions are enforced. *Boos v. National Fed'n of State High School Ass'ns,* 20 Kan.App.2d 517, 889 P.2d 797, 803 (1995).

■ Defendant argues that paragraph 3.9 allows it to charge as CAM expenses any costs associated with managing the property. The court disagrees. In paragraph 3.9, the word "managing" modifies the subject "common area" rather than the "property" as a whole: "[T]he common area expenses to include, without limitation, the operating, *managing,* equipping, lighting, repairing, replacing, and maintaining *the common areas.*" This conclusion is further supported by the fact that Paragraph 3.9 concludes by stating that CAM "shall specifically exclude all costs associated with the leasing activity in the shopping center and all capital expenditures." By its plain meaning, leasing activity encompasses all tenant-specific items—i.e. the payment of rent, problems on the property leased by an individual tenant, or actually securing new tenants. Similarly, the capital expenditures provision would exclude construction or remodeling costs that benefit a single tenant or the property as a whole rather than the common areas alone. Thus, only management costs related specifically to the common area are includable in the CAM expenses.

■ Defendant argues that plaintiff bears the burden of proof in this case, and that plaintiff has failed to prove that the

management costs are not related to CAM. Under the lease, however, plaintiff has the right to receive reasonable detail and breakdown regarding the CAM expenses. As a practical matter, this shifts the burden to defendant to show that the challenged expenses are CAM-related. Giving the provision such an effect is sound policy because defendant has complete control over all the records related to CAM expenditures. Furthermore, by not keeping records providing details, defendant has effectively circumvented plaintiff's right to audit the CAM expenses. Defendant has failed to provide any detail or breakdown with respect to the off-site management fee establishing its relationship to CAM. Accordingly, the off-site fees charged are excluded from CAM expenses. For future years, if defendant can provide reasonable, credible detail establishing that part of the off-site management fee is directly related to CAM, that portion of the fee is includable as CAM expenses. Based on the evidence, however, the court concludes that none of the off-site management fees for 1996 and 1997 were directly related to CAM. Based on the numerous management-related, but non-CAM-related, duties under the contract between KSK and defendant, the court has serious doubts regarding defendant's ability to show that any of the off-site management fee is directly related to management of the common area at Pecos Centre.

 With respect to the on-site management costs, defendant failed to provide reasonable detail for 1995 or 1996. In 1997, defendant categorized the office expenses. For all three years, defendant charged 100% of the respective expenses to CAM. The property manager, Christine Lovering, testified that everything done in that office is related to CAM. The court finds that Lovering's testimony lacks credibility. She offered purely conclusory statements that all of the expenses charged as CAM expenses were directly related to CAM. The court finds it impossible to believe that 100% of the property

manager and her assistant's work is directly related to CAM. This is particularly so in light of the fact Lovering admitted that she and her assistant spend time on tenant-specific matters, and the minimal documentation of the office expenses indicates that most resources are spent on leasing activity, which are expressly rejected under the CAM provision. Her position may be based on the erroneous interpretation of paragraph 3.9 that CAM includes all management of the property. In any event, the assertions are not credible. The court also notes that Lovering admitted at trial that some of the time and resources are spent on the Sahara Centre. None of those expenses are properly chargeable to CAM for Pecos Centre. Because only the expenses directly related to CAM at Pecos Centre are properly chargeable to tenants there, and there is no documentation or credible evidence regarding such expenses, the on-site management expenses are excluded. For future years, defendant is entitled to charge as CAM expenses any expenses that directly relate to CAM, including a portion of the compensation of on-site employees, but plaintiff is entitled under paragraph 3.9 to be provided with reasonable detail. Plaintiff may reasonably require that the percentage of time spent by the property manager or her assistant be evidenced by records of her daily time and the allocation of that time to various activities.

 Plaintiff argues that several of the office expenses, including rent for the management office, should not be chargeable as CAM expenses even if reasonable detail is provided. The court disagrees. The charges for 1996 and 1997 are not allowed because the evidence does not establish that they were attributable to CAM, and because defendant failed to provide reasonable detail and breakdown in response to plaintiff's request. However, the proportion that directly related to CAM may be chargeable to the extent that defendant can provide reasonable detail and breakdown establishing how the ex-

penses are directly related to CAM. Although the duty to record such detail regarding common area expenses may seem onerous, defendant brought the task on itself by agreeing to the lease provision requiring reasonable detail and breakdown.

█ The same principles apply to other expenses charged to the tenants under the CAM provision. The cellular phone charges for 1996 and 1997 are excluded because there is no credible evidence that they are directly related to CAM. It is unreasonable to think that the manager's phone was used solely for CAM purposes given the previous discussion of the on-site employees numerous non-CAM duties. For future years, however, any charges that are directly related may be included as CAM expenses if there is proper documentation of the relationship to CAM. Such documentation must include a record of the calls and purposes of the calls.

█ The security alarm line provides protection to the Pecos Centre by giving notice of fire or similar incident in a tenant's store. This not related to the common area and not properly chargeable under the Lease. The ADT security charges relate to security for the property manager's office. As previously indicated, this charge is excluded because there is no evidence of a proper proportion chargeable to CAM. For future years, if defendant can provide reasonable detail and breakdown indicating that a portion of the office use is related to CAM, then that proportion of the office security expense may be includable in the CAM expenses.

█ Plaintiff argues that defendant has failed to present documentation showing how the cleaning charges are related to the maintenance of the common area. The cleaning contract was not produced to plaintiff for its review, but several records were produced. Some of these records provide a sufficient indication that the services directly related to the common area. The records for special cleaning ($350.51)

and cleaning supplies ($1,156.46) provide no evidence that such goods and services were related to the common area. Those charges are, therefore, excluded. On the other hand, the cleaning contract ($51,-315.00) records—specifically, the Klean Rite Power Wash expenses breakdown for December 1996, January 1997, and February 1997—include several references to the common area. Those charges were appropriately charged as CAM expenses and reasonably documented. The December 1996 record includes the following CAM-related expenses: sidewalk cleaning ($2,400.00), landscape labor ($222.00), sprinkler maintenance ($468.00), lawn maintenance ($2,600.00), and porter common areas ($620.00). The January 1997 record indicates the following CAM-related expenses: sidewalk cleaning ($2,400.00), landscape labor ($68.00), sprinkler maintenance ($492.00), lawn maintenance ($2,600.00), and porter common areas ($620.00). The February 1997 record includes the following paid CAM-related expenses: landscape labor ($120.00), lawn maintenance ($1,733.34), and porter common areas ($400.00). All of these expenses—$14,741.34—are properly chargeable as CAM expenses. The evidence does not support including the remaining cleaning contract charges as CAM expenses, and defendant failed to provide plaintiff with reasonable detail and breakdown establishing that such expenses are related to CAM. Accordingly, the remaining cleaning costs are excluded from CAM expenses.

█ Defendant argues that plaintiff should be required to pay a share of the trash collection costs based on its proportionate share among tenants who use the service (14.61%), rather than the proportionate share of all leasable space in the Pecos Centre (4.0828%). The court disagrees. Paragraph 3.9 includes removal of trash as part of the common area expenses, and in previous years, defendant charged all trash services to CAM. Moreover, defendant charged the 1997 trash

expenses as part of the "Proportionate Share of CAM" on the Operating Expense Adjustment Invoice.[2] The court concludes that plaintiff is responsible for its proportionate share of the trash expense based on its CAM proportion of 4.0828%. The remainder of the trash expense is excluded from CAM expenses. For future years, if defendant separates trash service for the common area from trash service for specific tenants, and does not include trash expenses for specific tenants as part of the CAM expense, then plaintiff will be responsible for all of its tenant-specific trash expense and for its proportionate share of the common area trash expense.

■ Plaintiff also challenges various other repair and maintenance charges. First, plaintiff contends that legal services in the amount of $5,188.34 should not be charged as CAM expenses. Lovering testified at trial that the legal services were related to the common area because they were incurred after she towed away materials left on the property by a maintenance crew. As previously stated, the court finds that Lovering's testimony lacks credibility. Even if the court believed Lovering's explanation, the expenses would be excluded because plaintiff reasonably requested detail and breakdown regarding this expense, and received only invoices which included no description of the services and apparently referenced a specific tenant. Accordingly, the $5,188.34 for legal services is excluded. In the future, such legal services may be chargeable to CAM, but defendant must provide reasonable detail and breakdown indicating that the charges are directly related to CAM.

■ The Young Electric charges ($2,026.62) in 1996 are excluded from the CAM expenses because there is no evidence that the challenged charges are related to the common area. Likewise, the Abraham Mechanical Services charge ($250.00) is not properly chargeable to CAM because the evidence does not reflect

that it relates to CAM, and a portion of the July 23, 1997 Lamb Asphalt Maintenance ($450.00) is not properly chargeable because it is clearly marked "charge back to tenant." The November and December 1997 legal bills ($996.97) referring to Lamb and marked "CAM—Parking Lot Repairs" and "Parking Lot Repairs," respectively, are sufficient evidence to support inclusion of those expenses as CAM-related.

■ Paragraph 3.9 provides that plaintiff has a right to audit the CAM expenses and may recover costs of such an audit if the audit reveals an error in excess of three percent of the CAM expenses for the audited period. Defendant claims that plaintiff did not perform an audit because plaintiff's alleged auditor did not go to defendant's offices in San Francisco. The lease, however, provides that defendant must provide plaintiff with reasonable detail and breakdown. The lease does not require that plaintiff's auditor go to defendant's home office. Also, the lease does not require notice of an audit as a precedent to recovery of costs. In any event, the auditor notified defendant that he was performing an audit by at least March 1998. Plaintiff performed an audit under the lease for the CAM expenses in 1996 and 1997. The audit revealed errors, many of which defendant agreed to, far in excess of three percent for the applicable period. Plaintiff is entitled to recover from defendant the costs of the audit. Plaintiff provided evidence that the audit fees for 1996 and 1997 were $3,958.87 and $2,225.14, respectively. Accordingly, plaintiff is entitled to recover $6,184.01 in audit fees.

IT IS, THEREFORE, BY THE COURT ORDERED that:

1. For 1995, defendant improperly charged a total of $68,839.00 to CAM expenses. Plaintiff paid all of the CAM expenses for which it was billed in 1995, and is entitled to re-

---

2. Although the expense was not included on the itemized list of expenses, it was included in the total for the CAM expenses. Plaintiff correctly characterized it as a hidden cost.

cover its proportionate share of the improper expenses, $2,810.56.

2. For 1996, defendant improperly charged a total of $297,913.68 to CAM expenses. Plaintiff paid all of the CAM expenses for which it was billed in 1996, and is entitled to recover its proportionate share of the improper expenses, $12,163.22.

3. For 1997, defendant improperly charged a total of $359,563.33 to CAM expenses. Plaintiff paid all of the CAM expenses for which it was billed in 1997, and is entitled to recover its proportionate share of the improperly expenses, $14,680.25. Defendant also improperly charged plaintiff for trash services at a rate higher than its proportionate share of the gross leasable space. Accordingly, plaintiff is entitled to recover $6,459.11—the difference between the amount actually charged ($8963.88) and plaintiff's proportionate share of the trash services ($2504.77).

4. Plaintiff is also entitled to recover its audit fees in the amount of $6,184.01.

5. The court issues the following declaratory judgment:

For 1998 and subsequent years of the lease, plaintiff is entitled to receive reasonable detail and breakdown sufficient to distinguish between charges directly related to the common area and charges incurred for other purposes. In the future, defendant shall not charge as CAM expenses any costs that the court has determined are not related to CAM.

6. This Memorandum and Order closes the case.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**