**Affirmed in Part; Reversed; Rendered in Part; and Remanded; and Opinion filed July 18, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00414-CV

---

## CLEAR LAKE CENTER, L.P., Appellant

## V.

## GARDEN RIDGE, L.P., Appellee

---

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2009-58038**

---

### O P I N I O N

Garden Ridge, L.P. sued Clear Lake Center, L.P. for breach of a commercial real property lease. Garden Ridge claimed that Clear Lake charged Garden Ridge for impermissible management fees under the lease. Garden Ridge moved for summary judgment on its affirmative claim and on Clear Lake's counterclaim for declaratory relief. Clear Lake responded and moved for summary judgment on its affirmative defenses of limitations, res judicata, and waiver. The trial court

granted Garden Ridge's motion, held a jury trial on the issue of Garden Ridge's attorney's fees, and signed a final judgment awarding Garden Ridge $470,087.53 on its breach of contract claim, $530,000.00 in attorney's fees, conditional appellate attorney's fees, and contractual interest at a rate of eighteen percent, among other things.

We affirm in part, reverse the trial court's judgment in part and render judgment that Garden Ridge's claims accruing before September 10, 2005, are barred by limitations, and remand for further proceedings.

## BACKGROUND

In 1995, Garden Ridge and Fiesta Mart signed a commercial lease for Garden Ridge to rent space in Fiesta Mart's shopping center. Article VI of the lease concerned the common area of the shopping center, in part as follows:

> Section 6.1. Common Area. The term "Common Area" is defined for all purposes of this Lease as that part of the Shopping Center intended for the common use of all tenants, including among other facilities (as such may be applicable to the Shopping Center) parking area, sidewalks, drainage facilities, lighting facilities, drinking fountains, public toilets, and the like but excluding space in buildings (now or hereafter existing) designed for rental for commercial purposes, as the same may exist from time to time, and further excluding streets and alleys maintained by a public authority. . . .
>
> . . . .
>
> Section 6.3. Operation of Common Area. Landlord shall operate, manage and maintain the Common Area, the manner of operation, management and maintenance and the expenditures therefor to be in the sole discretion of Landlord, provided such operation, management and maintenance shall be comparable to similar shopping centers in Harris County, Texas. Landlord shall have the right to select a person to maintain and operate any of the Common Area if at any time Landlord determines that the best interests of the Shopping Center will be served by having any of the Common Area maintained and operated by that person. Landlord

2

shall have the right to negotiate and enter into a contract with that person on such terms and conditions and for such period of time as Landlord deems reasonable and proper, both as to services and as to cost.

Section 6.4. Common Area Costs. In addition to rentals and other charges prescribed in this Lease, Tenant shall pay to Landlord Tenant's Share of Common Area Costs (as hereinafter defined). "Common Area Costs", as used herein, means all sums expended by Landlord during the Lease Term in operating, managing, policing, equipping, lighting, repairing, replacing and maintaining the Common Areas, and an allowance to Landlord for Landlord's supervision of the Common Areas in an amount equal to seven and one-half percent (7-1/2%) of the total of all Common Area Costs. Common area Costs shall include, without limitation, costs of resurfacing and restriping the parking and driveway areas; repainting, cleaning, sweeping, and other janitorial services, policing, purchase, construction and maintenance of refuse receptacles, planting and relandscaping; directional signs and other markers; car stops; lighting and other utilities; installing, operating and maintaining Shopping Center identification signs; premiums on public liability and property damage insurance (excluding increases therein due to vacancy in the Shopping Center); maintenance, repair and replacement of utility systems, including water, sanitary and storm sewer lines and other utility lines, pipes and conduits serving the Shopping Center; drainage systems serving the Shopping Center; rental charges for machinery and equipment used in the operation, maintenance and repair of the Common Areas; costs of personnel to implement all of the foregoing, including wages, unemployment taxes and social security taxes; personal property taxes; fees for required licenses and permits; supplies; and other costs necessary in Landlord's judgment for the maintenance, operation and management of the Common Areas, but excluding depreciation of the original cost of constructing the Common Areas. . . . Tenant shall make such payments to Landlord at intervals not more frequent than monthly . . . . Such monthly or other periodic charges shall be based upon the Landlord's estimated annual Common Area Costs, payable in advance but subject to adjustment after the end of each calendar year during the term of this Lease on the basis of the actual Common Area Costs for such year. Upon the computation of such adjustment (which shall be completed within 180

3

days following the end of the calendar year to which such adjustment relates) and notice to Tenant, Tenant shall pay to Landlord the amount of any deficiency, or Landlord shall refund to Tenant the amount of any excess, as the case may be, such reimbursement or payment to be made within thirty days following the Tenant's receipt of such statement.

> Section 6.5. Common Area Costs. Landlord shall keep complete books and records for all Common Area Costs, and Tenant, at its expense, shall have the right to inspect, audit and copy such books and records upon reasonable notice during the business hours of Landlord or Landlord's property manager. Landlord shall promptly refund to Tenant any overpayment and Tenant shall promptly pay to Landlord any deficiency (in each case, within 30 days following completion of the audit) . . . .

The lease identified Garden Ridge's pro rata share of the "common area maintenance" (CAM) costs. Pursuant to Section 6.4 of the lease, Garden Ridge prepaid estimated CAM costs, and the landlord sent a reconciliation statement to Garden Ridge in the following year detailing the remainder of sums owed to the landlord for CAM costs.

Edwin Freedman signed the lease as president for the broker, United Equities, Inc., which also acted as the management company for the shopping center since the inception of the lease.

Vice President of Real Estate for Garden Ridge Patrick Willis testified by affidavit that Clear Lake purchased the shopping center from Fiesta Mart in 2003, and prior to that purchase, Fiesta Mart had never charged Garden Ridge a management fee, either as part of CAM costs or any other charge. Beginning in 2003, after Clear Lake acquired the shopping center, Clear Lake billed Garden Ridge for a "management fee" on the reconciliation statements detailing the CAM costs. The management fees Garden Ridge paid were as follows for years 2003 through 2009:

4

2003 — $58,259.14

2004 — $60,095.87

2005 — $75,561.47

2006 — $75,513.31

2007 — $72,947.20

2008 — $69,159.01

2009 — $84,013.87

Willis explained that Garden Ridge also paid the seven and one-half percent "supervisory fee" on top of the management fees, so Garden Ridge paid a total of $470.087.53 to Clear Lake in "management fees plus the supervisory fee applied to the management fees." Each year until the 2008 reconciliation payment was due, Garden Ridge paid the management fee. For the 2008 and 2009 years, Garden Ridge paid "under protest."

In 2009, Garden Ridge's auditor conducted an audit of the charges billed under the lease for 2004 through 2008 and concluded that Clear Lake "charged exorbitant Management Fees to Tenant in the annual CAM reconciliations." The auditor concluded, "All Management Fees are paid to an affiliate of Landlord pursuant to a Property Management and Leasing Agreement dated April 16, 2003 between Landlord and United Equities Incorporated." Willis testified that the audit showed the "management fee that had been charged by Clear Lake and paid by Garden Ridge had predominantly been for non-common area services."

In the course of this audit, Garden Ridge received a copy of the property management and leasing agreement. Freedman signed the agreement on behalf of both entities—as president of United Equities and president of CL Group, Inc., general partner of Clear Lake. Freedman testified that he negotiated the terms of the agreement for both entities.

5

Under the management and leasing agreement, United Equities managed, leased, and operated the entire shopping center property. Clear Lake gave United Equities the "powers and duties" to, among other things, bill and collect rents and other charges from tenants, maintain the property and common areas of the property, make arrangements for utilities, pay taxes, acquire and keep licenses, and pay operating expenses. As compensation for United Equities' services in managing the property, Clear Lake agreed to pay United Equities a "management fee" equal to five percent of the monthly gross collections.

Freedman testified extensively about United Equities' management activities, both related and unrelated to the common area. He testified that under the management agreement, United Equities' responsibilities included "operating, overseeing, [and] supervising everything in the common area." He explained further:

> But to be very honest, my interest and job description, I feel, as a company is to be managing the entire shopping center situation. And, that would include the rights of tenants among other tenants. If somebody was doing something that they were not supposed to be selling or doing, that comes under management. And, I'm not so sure that I can define that as being part of standing inside somebody's space or in the common area. But there's no doubt I have to manage the common areas. But there's so many other issues, just like the condemnation. I don't know how you define that, but I have to take care of those as a management company.

Freedman also testified that "leasing and doing the leases . . . still falls into the overall scope of managing a property." He explained that "trying to get people into the center" and keeping it "leased" and "occupied" was a "management duty." When asked whether promoting the shopping center was part of managing the common area, he testified, "I don't know. I just think it's — I don't, really, you know, separate it out."

Freedman answered "no" to the question: "Would you agree with me that the management fee that is charged, is charged for supervision of activities related to the common area?" When asked what the difference was between managing and supervising, Freedman answered:

> Well, I think that if you're supervising, you're probably in the common area overseeing work that is being done in the common area. It might be landscaping. It might be parking lot striping. It might be parking situations, signage, et cetera. If you're managing the property, you are dealing with, and an easy way to say it, everything else but the supervision. It could be rent collections. It could be having to do with, as I've talked earlier, I think a number of times: about making sure the tenants are doing a proper use provision; to handle condemnation situations; to handle casualty; to handle the hurricane situations; to try and keep the occupancy to an extent that Garden Ridge and others have proper co-tenants. So all the items that — to decide whether you need some type of promotions in marketing, to deal with delinquencies. To collect the rents so you have the money to operate the shopping center.

Freedman acknowledged that "part of what the [United Equities] people do are involved in management and part of what they do are involved in supervision," and he said that the tenants were paying Clear Lake for "management and supervision." He testified that a "management duty" could be "within the common area or within demised premise[s]."

The summary judgment record also includes evidence concerning Garden Ridge's bankruptcy proceeding in 2004 and 2005. As part of this proceeding in 2005, Garden Ridge signed an amendment to the lease agreeing to pay a "cure amount" for 2003 CAM charges. Garden Ridge's reorganization plan designated the lease as one to be assumed pursuant to the plan, and the bankruptcy court confirmed the plan, decreeing that Garden Ridge assumed the lease. Freedman testified by affidavit concerning a conversation he had with a representative of

7

Garden Ridge during the bankruptcy proceeding: "While I do not recall the specific details of the conversation, I know that we discussed each element of the increased CAM estimate, with particular emphasis on the management fee. . . ." Willis acknowledged in his affidavit that the reconciliation for 2003 included a "management fee."

Garden Ridge sued Clear Lake for breach of contract and declaratory relief, among other things, on September 10, 2009. Clear Lake also sought declaratory relief and alleged various affirmative defenses.[1] Garden Ridge moved for a summary judgment on its breach of contract claim and on Clear Lake's claim for declaratory relief. Clear Lake filed a response and cross-motion for summary judgment "on the construction of the lease and on the defenses of limitations, res judicata and waiver." The trial court ultimately granted Clear Lake's motion, awarding $470,087.53 in damages and ordering that Clear Lake "may not charge management fees not related to the management or maintenance of the Common Areas for the remainder of the subject lease." A jury later awarded attorney's fees to Garden Ridge, and the trial court entered a final judgment incorporating its summary judgment order and the jury's verdict.[2]

Clear Lake filed a timely notice of appeal and challenges the trial court's decision to grant summary judgment for Garden Ridge and deny Clear Lake's motion for summary judgment.

---

[1] Part of Clear Lake's request included a declaration that "the Landlord is entitled to charge both a Management Fee and a Supervision Fee."

[2] The court decreed that for the remainder of the lease, Clear Lake "may not charge management fees not related to the management or maintenance of the Common Areas."

## STANDARD OF REVIEW

We review de novo the trial court's decision to grant a summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009). When reviewing cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001); *see also Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 153–54 (Tex. 2010).

The movant for a traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In particular, a plaintiff moving for summary judgment on its own claim must conclusively prove all essential elements of its claim. *Cullins v. Foster*, 171 S.W.3d 521, 530 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (citing *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986)). Likewise, a defendant moving for summary judgment on its affirmative defense must conclusively prove each element of that defense. *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001).

Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005); *see also Appleton v. Appleton*, 76 S.W.3d 78, 83 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We review the summary judgment evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848.

ANALYSIS

In three issues Clear Lake contends the trial court erred (1) by granting summary judgment to Garden Ridge on its breach of contract claim because Garden Ridge failed to conclusively prove (a) breach and (b) damages;[3] (2) denying Clear Lake's motion for summary judgment on its affirmative defenses of (a) res judicata, (b) estoppel, (c) waiver, and (d) limitations; and (3) awarding eighteen percent pre- and post-judgment interest instead of a lower statutory rate.

We agree with Clear Lake that Garden Ridge failed to conclusively prove damages, and the trial court should have granted summary judgment in part to Clear Lake on its affirmative defense of limitations.

## 1.    Garden Ridge's Motion for Summary Judgment

### a.    *Breach & Construction of the Lease*[4]

Relying on the phrase "sole discretion" in Section 6.3 of the lease, Clear Lake argues that Garden Ridge has "no enforceable claim unless it can show that the fees charged were ***not*** comparable to similar shopping centers in Harris County, Texas." Garden Ridge presents two potential theories of recovery. First, Garden Ridge claims that the lease does not allow for any "management fee" to be charged for CAM because such a fee would be duplicative of the seven and one-half percent "allowance" provided for in Section 6.4. Second, Garden Ridge

---

[3] In the argument section of Issue (1)(b), Clear Lake also contends that we should reverse the award of attorney's fees if reversing the damages award.

[4] As discussed below, we hold that Garden Ridge failed to conclusively prove damages, and therefore, we must reverse the trial court's summary judgment on liability. *See* TEX. R. APP. 44.1(b); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 151–52 (Tex. 2012); *Okorafor v. Lewis*, No. 14-08-00130-CV, 2010 WL 1343125, at *4 (Tex. App.—Houston [14th Dist.] Apr. 6, 2010, no pet.) (mem. op.). We address liability only to the extent it informs our resolution of the damages issue because any ruling on liability would be advisory. *See Buc-ee's, Ltd. v. Hribek*, No. 03-08-00120-CV, 2009 WL 5149922, at *3 (Tex. App.—Austin Dec. 31, 2009, no pet.) (mem. op.).

contends that if the lease indeed authorizes a management fee for CAM, Clear Lake charged Garden Ridge for non-CAM expenditures, and this was a breach of the lease. We reject Garden Ridge's first theory (no management fee) but agree with the second (no non-CAM expenditures).

The lease unambiguously authorizes Clear Lake to charge a separate fee, in addition to the "allowance" or "supervisory fee," for the management of the common area. Section 6.3 of the lease requires the landlord to "operate, manage and maintain the Common Area" with "the expenditures therefor to be in the sole discretion of the Landlord." This section also allows Clear Lake to "select a person to maintain and operate any of the Common Area" and "enter into a contract with that person on such terms and conditions . . . as Landlord deems reasonable and proper, both as to services and as to cost." Further, Section 6.4 of the lease requires Garden Ridge to pay its share of "common area costs," with that term defined as "all sums expended by Landlord . . . in operating, managing, . . . and maintaining the Common Areas, **and** an allowance to Landlord" (emphasis added). The "allowance" or "supervisory fee" is clearly an additional fee and not duplicative of any other management costs expended by the landlord, which may include costs of another person maintaining the common area. *See McDonald's Corp. v. Goler*, 560 N.W.2d 458, 461 (Neb. 1997) (similar lease unambiguously required tenant to pay landlord's fees paid to a management company in addition to an administrative fee of fifteen percent of all common area costs).

The lease unambiguously limits the allowable fee, however, to sums expended for the management and maintenance of the common area—not the property as a whole. Contrary to Clear Lake's argument, the "sole discretion" phrase in Section 6.3 does not alter the fact that the "expenditures therefor" relates to Clear Lake's duty to "operate, manage and maintain the Common Area." The

11

"all sums expended" language in Section 6.4 is limited to costs for operating, managing, and maintaining (among other things), "the Common Areas."

Clear Lake suggests that its construction of the lease, based on the "sole discretion" language, is mandated by our decision in *T.F.W. Management, Inc. v. Westwood Shores Property Owners Association*, 79 S.W.3d 712 (Tex. App.— Houston [14th Dist.] 2002, pet. denied). In that case, the plaintiff sued for an equitable accounting although the contract clearly gave the plaintiff no such right. *See id.* at 718. This court did not hold that the lease's "sole discretion" language would somehow bar an action for breach of contract. *See id.* at 718–19.[5] *T.F.W. Management* is not instructive, and we do not follow Clear Lake's construction of the lease.

Having determined that Clear Lake does not have discretion to charge non-CAM expenses, we turn to the question of whether summary judgment was proper on the issue of damages. We review the damages issue under the theory that the lease authorizes Clear Lake to charge a management fee, but not a fee unrelated to CAM. For purposes of this appeal, we assume without deciding that Garden Ridge conclusively established Clear Lake's breach of the lease by charging non-CAM management fees.

### b.    *Damages*

Clear Lake contends that "Garden Ridge did not meet its burden to prove an amount of compensable damages, and it certainly did not prove it was entitled to *all* management fees paid." Clear Lake argues that Garden Ridge is not entitled to recovery of the entire management fee paid because at least some fees are allowed

_____

[5] In particular, both the majority and concurring justices reasoned than an equitable accounting was not proper, in part, because standard discovery procedures (presumably for a breach of contract claim) would have been adequate. *See* 79 S.W.3d at 717–18 & n.5; *id.* at 721 (Brister, C.J., concurring).

12

under the lease, and the record contains evidence that some of United Equities' management activities were related to the common area. Garden Ridge responds that it was entitled to recover the entire management fee for three reasons:

- "First, there was no material dispute of fact that the Management Fee as a whole was not a 'Common Area Cost' because it was incurred in managing the entire Center, not the Common Area."

- "Second, even if some sort of apportionment would have been appropriate, Clear Lake failed to produce any evidence demonstrating what portion, if any, of the Management Fee was incurred in managing the Common Areas. In fact, Clear Lake admitted that it kept no such records."

- "Third, the entirety of the Management Fee was Improper because that Fee duplicated the 7.5% allowance already paid under the lease for supervision of the Common Areas."

We will address each in turn.

### i. **Garden Ridge's First Argument**

This argument is essentially that proving breach entitles Garden Ridge to the whole amount of the management fee paid, yet Garden Ridge's own authorities contradict such a broad assertion. *See Goler*, 560 N.W.2d at 940 (concluding that the trial court erred by granting summary judgment to the plaintiff for the entire amount of a management fee when the parties did not dispute that some of the management company's duties "were not performed in conjunction with the common area, while others were so related"); *see also Sheplers, Inc. v. Kabuto Int'l (Nev.) Corp.*, 63 F. Supp. 2d 1306, 1313–14 (D. Kan. 1999) (ruling that "management costs related specifically to the common area are included in the CAM expenses" and the defendant could charge such management expenses to the tenant). Garden Ridge provides no substantive analysis or citation to authority to support its position.

The summary judgment evidence raises a genuine issue of material fact because at least some of United Equities' management activities, for which the management fee was paid, were for the common area of the shopping center. Garden Ridge's own witness testified by affidavit that the management fee was "predominantly"—not exclusively—for non-CAM services. The management agreement described United Equities' duty to maintain "the property and common areas thereof." Freedman testified that at least part of United Equities' responsibilities under the management agreement was "operating, overseeing, [and] supervising everything in the common area."

We hold that the mere fact of breach does not entitle Garden Ridge to recover the entire management fee. By only submitting evidence regarding the total management fee paid, Garden Ridge failed to conclusively prove its measure of damages. *Cf. Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 776–77 (Tex. 2009) (requiring remand or remittitur when some evidence supported an award of damages entered on the jury's verdict, but "just not at the level awarded by the trial court"; damages award failed to reflect offset for the plaintiff's interest in a joint venture).

### ii.    Garden Ridge's Second Argument

Garden Ridge relies exclusively on the *Sheplers* decision, in which the United States District Court for the District of Kansas, without citing any authority, "shift[ed] the burden to defendant to show that the challenged expenses [were] CAM-related" because the defendant had "complete control over all the records related to CAM expenditures." 63 F. Supp. 2d at 1314. Garden Ridge has cited no Texas authority shifting the burden on summary judgment, and generally, a plaintiff bears the burden of proving his or her measure of damages. *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010); *McLane v.*

14

*Maurer*, 66 S.W. 693, 695 (Tex. Civ. App. 1902, writ ref'd).

Garden Ridge suggests the burden should be shifted to Clear Lake because "Clear Lake claimed to have no time records or any other basis for determining the amount of time spent by United Equities employees on managing the Common Areas." Garden Ridge bases its request for a burden shift on several responses that United Equities personnel gave in depositions concerning the lack of record-keeping.[6]

But even assuming that Clear Lake had a duty to preserve the evidence necessary to establish the correct calculation of Garden Ridge's damages,[7] and that Clear Lake failed in this duty, Garden Ridge did not ask the trial court to award discovery sanctions or to apply a spoliation presumption.[8] Under some circumstances, a defendant may be barred from contesting the amount of damages as a discovery sanction,[9] or the trial court may apply an evidentiary presumption in

---

[6] Freedman was not "aware of" any records detailing how much time administrative staff spent on particular tasks or any one of the twenty-seven shopping centers managed by United Equities. William Corrigan testified that there were no records providing any information on how much time employees at United Equities spent on managing the Clear Lake shopping center. Corrigan also was unable to provide an estimate of how much time any employees spent providing services for the Clear Lake shopping center. Corrigan had no estimate of how much time the primary employee working on the Clear Lake shopping center spent on various tasks, such as supervising CAM costs or tenant relations.

[7] Clear Lake has a contractual duty to "keep complete books and records for all Common Area Costs," but we do not decide today whether this is the type of "duty" that would give rise to a spoliation presumption or discovery sanction. *Compare Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003) ("Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim."), *with Trevino v. Ortega*, 969 S.W.2d 950, 955 (Tex. 1998) (Baker, J., concurring) ("A party may have a statutory, regulatory, or ethical duty to preserve evidence.").

[8] *See Trevino*, 969 S.W.2d at 954 (Baker, J., concurring) ("When a party believes that another party has improperly destroyed evidence, it may either move for sanctions or request a spoliation presumption instruction.").

[9] *See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 186 (Tex. 2012)

the plaintiff's favor for the spoliation of evidence.[10]

Without Garden Ridge pursuing a proper remedy in the trial court, however, we will not "transform a presumption or sanctionable event into a conclusively established fact for summary judgment purposes." *Kang v. Hyundai Corp. (U.S.A.)*, 992 S.W.2d 499, 502 (Tex. App.—Dallas 1999, no pet.); *accord Meru v. Huerta*, 136 S.W.3d 383, 389 (Tex. App.—Corpus Christi 2004, no pet.). The burden remained on Garden Ridge to conclusively establish its damages for a summary judgment. Given that the record is replete with evidence that some of United Equities' management activities—for which the fee was paid—concerned management of the common areas, we must conclude Garden Ridge failed to conclusively prove its damages were equal to the entire management fee paid.

### iii. Garden Ridge's Third Argument

We have already rejected Garden Ridge's interpretation of the contract that would allow it to recover the entirety of the management fee as being duplicative of the "allowance" or "supervisory fee." Under the unambiguous terms of the contract, Clear Lake is not prohibited from contracting with a third party for management of the common area and passing on to Garden Ridge a pro rata share of those expenses.

Accordingly, Garden Ridge failed to conclusively prove that its compensable damages amounted to the entire management fee paid to Clear Lake,

("The destruction of evidence that directly and significantly impairs a party's ability to prove damages might reasonably justify a sanction like the one in this case"—barring the other party from contesting damages); *see also* TEX. R. CIV. P. 215.2(b)(4) (providing that a sanction for failure to comply with a proper discovery request may include an order that "designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order").

[10] *See, e.g.*, *Walker v. Thomasson Lumber Co.*, 203 S.W.3d 470, 477 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (spoliation "may give rise to a presumption that the missing evidence was unfavorable to the spoliator").

and the trial court should not have granted summary judgment on the damages issue.

Clear Lake's first issue is sustained.

## 2. Clear Lake's Motion for Summary Judgment

### a. Res Judicata

Clear Lake contends it conclusively established all elements of its affirmative defense of res judicata based on the bankruptcy court's confirmation of Garden Ridge's Chapter 11 plan in 2005, and the trial court erred by not rendering judgment for Clear Lake. We disagree.

Federal law controls the determination of whether a federal court's judgment should bar a state court action. *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 718 (Tex. 1990). "Under federal law, the doctrine of res judicata will apply if: (1) the parties are identical in both suits; (2) the prior judgment is rendered by a court of competent jurisdiction; (3) there is a final judgment on the merits; and (4) the same cause of action is involved in both cases." *Id.*

The primary issue in this case concerns the fourth element of res judicata.[11] This element is satisfied if the two actions are based on "the same nucleus of operative facts." *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990). Under this test, the same action includes "'all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction (or series of connected transactions).'" *Id.* at 1144 n.10 (quoting *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 560 n.4 (5th Cir. 1983)). "A party may not avoid the preclusive [e]ffect

---

[11] The parties do not dispute the first two elements, and it is clear from federal decisions that a bankruptcy court's order confirming a plan of reorganization is a final judgment on the merits. *See, e.g.*, *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 (11th Cir. 1990) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 170–71 (1938); *Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972)).

17

of res judicata by asserting a new theory or a different remedy." *Id.* Res judicata will bar "all claims that were or *could have been* advanced in support of the cause of action on the occasion of its former adjudication." *Id.* at 1144 (quotation omitted).

It is undisputed Garden Ridge is not suing Clear Lake for a breach of contract related to the 2003 CAM charge that Garden Ridge actually agreed to pay Clear Lake in the reorganization plan as a "cure" amount. This lawsuit concerns Clear Lake's alleged breaches *after* the confirmation of the Chapter 11 plan—each year from 2005 onward. Clear Lake cites no authority for applying res judicata to bar a breach of contract claim that arose after confirmation of the plan, and there is authority to the contrary. *See TransAmerican Nat. Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 596 (Tex. App.—San Antonio 1996, writ denied) (res judicata did not bar a royalty interest holder's claim for royalties accruing after the date of the bankruptcy court's confirmation of the debtor's plan, by which prior claims were settled, because the holder's claim arose after confirmation of the plan). Further, there is no evidence in this record that Garden Ridge knew at the time of the plan's 2005 confirmation that Clear Lake had charged or intended to charge Garden Ridge for management of the entire shopping center property unrelated to the common areas. There is no evidence that the parties or the bankruptcy court construed the lease to require Garden Ridge's payment of non-CAM management expenses. Given that Garden Ridge's claims had not arisen and were not foreseeable before confirmation of the plan, the claims could not have been advanced in the bankruptcy litigation.

Clear Lake relies on the Fifth Circuit's decision in *Howe*, where the subsequent suit arose out of the same nucleus of operative facts concerning an earlier bankruptcy proceeding. In *Howe*, the debtors brought a lender liability

18

action against a creditor—claiming violations of fiduciary and contractual duties, state securities laws, and state law fraud—based on a loan transaction that had been previously contested, settled, and confirmed in a prior Chapter 11 bankruptcy plan. *See* 913 F.2d at 1140–41. During adversary proceedings in the bankruptcy court, the debtors contested the validity of the lien and contended that the loan was usurious. *Id.* at 1144. The creditor's loan had been the "only major claim against the estate" in the bankruptcy court, *id.*, and "[e]very facet of [the creditor's] loan was the subject of litigation and negotiation" in the bankruptcy court, *id.* at 1147. Further, the debtors had been "aware of the basic facts underlying their claims" at the time the bankruptcy court confirmed the plan. *Id.* The same cannot be said about Garden Ridge. As mentioned above, there is no evidence Garden Ridge knew that part of the management fee paid as part of the 2003 CAM cure amount was for non-CAM expenses. Garden Ridge's current claims are not based on a nucleus of operative facts litigated in the bankruptcy proceeding.

Accordingly, we conclude the trial court correctly denied Clear Lake's motion on this ground.

### b.   Estoppel

Clear Lake contends it conclusively proved its affirmative defenses of judicial estoppel and equitable estoppel. Garden Ridge argues that Clear Lake waived these defenses by not raising them in the summary judgment motion or response.[12]

In the summary judgment context, "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on

---

[12] In its reply brief on appeal, Clear Lake "limits its reply to the affirmative defenses of res judicata, waiver, and limitations" because "of Garden Ridge's complaint that certain affirmative defenses were not preserved for appeal."

19

appeal as grounds for reversal." TEX. R. CIV. P. 166a(c); *see also, e.g.*, *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). Clear Lake did not raise any estoppel defenses in its motion for summary judgment. Accordingly, we may not reverse on these grounds.

### c. Waiver

Clear Lake contends it conclusively proved its affirmative defense of waiver, whereby "Garden Ridge [1] waived any claim that the Lease does not authorize a management fee and [2] waived any right to question the calculation of the fee." Given our construction of the lease above—that the lease indeed allows Clear Lake to charge a management fee—we need not address Clear Lake's first point. We disagree with Clear Lake's second point.

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.* And even if a party to a contract could be charged with notice of its right and then acts inconsistent with the right, waiver cannot be asserted to create a new contractual liability. *See id.*

Clear Lake cites no case holding that a party to a contract waived a right when the plaintiff did not actually know facts pertinent to the breach. For example, in *Tenneco Inc. v. Enterprise Products Co.*, the Texas Supreme Court found waiver established as a matter of law for a contractual provision prohibiting assignment of an ownership interest in a fractionation plant unless the assignee agreed to deliver 31,000 barrels of natural gas liquids per day to the plant. 925 S.W.2d 640, 642–43 (Tex. 1996). The assignee never agreed to the delivery

requirement and failed to meet the quota for three years. *Id.* The evidence showed that the plaintiffs actually knew that the assignor had transferred its ownership interest to the assignee, and the plaintiffs accepted the assignee's delivery of less than 31,000 barrels per day for three years. *Id.* at 643. Thus, actual knowledge was key to establishing waiver.

As a matter of law, Garden Ridge did not relinquish its right to pay only CAM expenses under the lease by simply paying Clear Lake the management fee within the bankruptcy proceeding or afterward. Garden Ridge paid the management fee without actually knowing that the fee was in part a non-CAM expense. Garden Ridge's lack of knowledge is crucial. *See Enterprise-Laredo Assocs. v. Hachar's, Inc.*, 839 S.W.2d 822, 836 (Tex. App.—San Antonio 1992) (settlement agreement whereby parties agreed to "waive any other violations of the Lease" occurring before a particular date did not establish affirmative defense of waiver when the plaintiff "was not aware of the CAM overcharges at the time it signed the agreement"; thus, the plaintiff did not waive the right to sue for CAM overcharges), *writ denied*, 843 S.W.2d 476 (Tex. 1993) (per curiam). Indeed, Clear Lake included the management fee on the CAM reconciliation statements, thereby suggesting that the entirety of the fee was a proper CAM expense.

The trial court correctly denied Clear Lake's motion on this ground.

### d.    *Limitations*

Clear Lake contends it conclusively proved that "any damages that accrued prior to September 10, 2005, were barred by limitations." Garden Ridge acknowledges that the four-year statute of limitations "implicates" the 2004 management fee because suit was not filed until September 10, 2009, but Garden Ridge contends that the claim is not barred because of the discovery rule and "Clear Lake's own misrepresentations delayed prosecution of this claim." We

agree with Clear Lake that any claims accruing prior to September 10, 2005, are barred by the statute of limitations, including Garden Ridge's claim for the 2004 management fee.

A breach of contract claim accrues when the contract is breached. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006). But accrual may be deferred by the discovery rule if "'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'" *Id.* at 313 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)). The Texas Supreme Court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes." *Id.* The discovery rule may apply to a breach of contract claim, but "those cases should be rare, as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims." *Id.* at 315.

"'An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence.'" *Id.* at 313–14 (quoting *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex. 2001)). Due diligence requires that contracting parties protect their own interests. *Id.* at 314. Thus, due diligence "may include asking a contract partner for information needed to verify contractual performance." *Id.* "If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment." *Id.* "But failing to even ask for such information is not due diligence." *Id.* Whether an injury is inherently undiscoverable is a "legal question . . . decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Id.*[13]

---

[13] And similar to the discovery rule, fraudulent concealment will delay the statute of limitations only until the fraud is actually discovered or "'could have been discovered by the

22

Garden Ridge's injury is not of the type that is inherently undiscoverable because the injury could have been discovered with the exercise of due diligence. Garden Ridge paid the 2004 CAM charge without question and without requesting an audit, for which it had a contractual right under Section 6.5 of the lease. Garden Ridge could have inquired about the management fee as soon as Clear Lake sent the reconciliation, but Garden Ridge did not do so. Instead, Garden Ridge waited four years to request an audit, and there is no evidence Clear Lake provided false information during the course of the audit—indeed, the management agreement that Clear Lake provided during the audit is precisely how Garden Ridge learned of the breach. *See TH Healthcare Ltd. v. Patino*, No. 13-06-602-CV, 2007 WL 2128909, at *5 (Tex. App.—Corpus Christi July 26, 2007, pet. denied) (mem. op.) (injury was not inherently undiscoverable because the contract allowed for reconciliation of overpayments to be conducted, and if the plaintiff had conducted its reconciliation and audit, it would or should have known of the injury at that time); *see also HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (declining to apply discovery rule and fraudulent concealment exceptions when the defendant gave the plaintiffs "whatever information they wanted").

Further, unlike in *Enterprise-Laredo Associates*, where the discovery rule tolled the limitations until the tenant was put on notice by a substantial increase in the CAM charge for one year, *see* 839 S.W.2d at 826, 838, it is undisputed that Garden Ridge first learned of the new management fee outside the limitations period. Specifically, Willis testified by affidavit that Fiesta Mart had never charged a management fee, and Clear Lake began charging a management fee in 2003. We hold as a matter of law that a tenant acting with due diligence could have discovered this type of injury by asking Clear Lake for information needed to

defrauded party by exercise of reasonable diligence.'" *Computer Assocs. Int'l*, 918 S.W.2d at 456 (quoting *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979)).

verify contractual performance. To apply the discovery rule exception in this type of case would frustrate the purpose of limitations, given that Garden Ridge had a contractual right to audit and declined to exercise that right for many years despite a new and substantial fee being charged. *Cf. HECI Exploration Co.*, 982 S.W.2d at 887–88 ("A royalty owner who makes no inquiry for years on end cannot then sue for breaches of contract that could have been discovered within the limitations period if reasonable diligence had been exercised.").

Finally, Clear Lake contends that the statute of limitations should bar not only the 2004 fee, but also a "pro-rated share of the 2005 management fee prior to suit being filed." Clear Lake contends that Garden Ridge is barred from recovering any money that Garden Ridge paid as *estimated* CAM charges before September 10, 2005, and thus implicitly contends that Garden Ridge's claims for breach accrued each month as it made estimated CAM payments, rather than when Clear Lake determined the *actual* CAM charges during the reconciliation process in 2006. *But see Patino*, 2007 WL 2128909, at \*3 (parties agreed that a reconciliation requirement in the contract triggered the accrual date for any claim for breach). This particular argument was not made to the trial court in Clear Lake's motion for summary judgment, and Clear Lake pointed to no evidence and made no argument concerning the accrual date of Garden Ridge's claims.[14] We cannot reverse on this basis. *See, e.g.*, TEX. R. CIV. P. 166a(c); *McConnell*, 858 S.W.2d at 341.

Accordingly, the trial court should have granted Clear Lake's motion for summary judgment on its affirmative defense of limitations regarding Garden Ridge's claim for the 2004 management fee.

---

[14] The defendant has the burden to "conclusively establish when the action accrued." *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 867 (Tex. App.—San Antonio 1997, no pet.).

Clear Lake's second issue is sustained in part.

### 3. Interest

Clear Lake contends that the trial court erred in awarding pre- and post-judgment interest at a rate of eighteen percent because Garden Ridge is not entitled to this rate based on any language found in the lease. Because we reverse the trial court's award of damages, we also reverse the award of interest. *See, e.g.*, *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 112 (Tex. App.—Houston [14th Dist.] 2013, pet. filed) (reversing interest when damages reversed); *Total E & P USA, Inc., v. Mo-Vac Serv. Co.*, No. 13-10-00021-CV, 2012 WL 3612505, at *10 (Tex. App.—Corpus Christi Aug. 23, 2012, pet. denied) (mem. op.) (same).[15]

### 4. Attorney's Fees

Clear Lake contends that we must reverse the trial court's judgment regarding attorney's fees if we reverse the damages award. We agree. One important factor is the "results obtained," and "we are not reasonably certain that the jury was not significantly affected by the error." *See, e.g.*, *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006) (reversing the jury's award of attorney's fees when the correct measure of damages was one-seventh of the erroneously awarded amount).

### 5. Reversal of Liability

Finally, although we do not hold that the trial court erred by granting summary judgment to Garden Ridge on the issue of liability, "we are compelled, under current Texas Law, to reverse the judgment and remand for a new trial on liability and damages." *Okorafor*, 2010 WL 1343125, at *1.

---

[15] We decline to address what rate, if any, would be applied if Garden Ridge ultimately prevails.

Rule 44.1 of the Texas Rules of Appellate Procedure states that even if error affects only part of the trial court's judgment, we "may not order a separate trial solely on unliquidated damages if liability is contested." TEX. R. APP. P. 44.1(b); *see also Rancho*, 383 S.W.3d at 151–52. This rule applies when we reverse a summary judgment because of the plaintiff's failure to conclusively prove damages. *Okorafor*, 2010 WL 1343125, at *4; *see also Rosales v. Williams*, No. 01-09-00454-CV, 2010 WL 457536, at *6 (Tex. App.—Houston [1st Dist.] Feb. 11, 2010, no pet.) (mem. op.) (reversing the whole summary judgment for landlord because damages were not conclusively established for breach of a residential lease, liability was contested by filing a general denial, and damages were unliquidated).

Clear Lake contested liability by filing a general denial. *See, e.g.*, *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001). And the damages in this case are unliquidated because they cannot be determined from reviewing the petition and written instruments on file. *See Freeman v. Leasing Assocs., Inc.*, 503 S.W.2d 406, 408 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ) (holding that a "claim is liquidated if the amount of damages can be accurately calculated by the court, or under its direction, from the allegations contained in plaintiff's petition and the instrument in writing"; noting that a "seemingly liquidated claim" for breach of an equipment lease may actually be "unliquidated . . . when the petition alleges insufficient facts").[16]

---

[16] *See also Ingram Indus., Inc. v. U.S. Bolt Mfg., Inc.*, 121 S.W.3d 31 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (damages had "the appearance of being liquidated," but the damages "should have been treated as unliquidated" because "written instruments, such as invoices or receipts, were not produced along with the affidavit"); *Arnold v. Allen Ctr. Co. No. 2*, 747 S.W.2d 17, 18–19 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (damages were "clearly unliquidated" for breach of a commercial real property lease when the petition alleged the monthly rental rate and the amount that the tenant was "presently indebted" to the landlord).

Accordingly, we must reverse the trial court's judgment on liability as well as damages.

## CONCLUSION

The trial court erred by granting summary judgment to Garden Ridge and denying Clear Lake's motion for summary judgment in part on the limitations defense.

We affirm in part, reverse the trial court's judgment in part and render judgment that Garden Ridge's claims accruing before September 10, 2005, are barred by limitations, and remand for further proceedings.


/s/        Sharon McCally
Justice

Panel consists of Justices Christopher, Jamison, and McCally.