**Opinion issued December 12, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-21-00376-CV

———————————————

**7677 GROUP, L.P., Appellant**

**V.**

**SMS FINANCIAL JDC, L.P., AS ASSIGNEE OF FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF FIRST NATIONAL BANK (EDINBURG, TEXAS), Appellee/Cross-Appellant**

**V.**

**GAL BATZRI, Cross-Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-05379**

---

# MEMORANDUM OPINION

This appeal arises from a promissory note and a personal guaranty agreement. SMS Financial JDC, L.P. ("SMS"), as Assignee of Federal Deposit Insurance Corporation, Receiver of First National Bank Edinburg, Texas, Appellee/Cross Appellant, sued 7677 Group, L.P., Appellant, and Gal Batzri, Cross-Appellee, on the promissory note and guaranty, respectively.

The trial court granted summary judgment and dismissed SMS's claims against Batzri based on the statute of limitations. Following a bench trial, the trial court entered judgment in favor of SMS and against 7677 Group on the promissory note.

In three issues on appeal, 7677 Group argues that the trial court erred in (1) rendering judgment for SMS because SMS failed to prove that it is the owner and holder of the note, (2) awarding damages and other relief to SMS because 7677 Group was not given credit for all payments made on the debt or for the value of collateral pledged to First National Bank, and (3) awarding prejudgment interest to SMS.

SMS filed a cross-appeal seeking reversal of the trial court's summary judgment in favor of Batzri, on the personal guaranty agreement.

We affirm in part and reverse and remand in part.

## Background

On February 20, 2010, 7677 Group executed a promissory note (the "Note") in the amount of $323,972.40 payable to First National Bank in Edinburg, Texas ("FNB"). The Note renewed a $500,000 line of credit opened by 7677 Group in December 2008. The Note matured on February 20, 2011. Under the terms of the Note, 7677 Group would make 12 payments; 11 monthly payments of $2,000, and a single "balloon payment" of the entire remaining unpaid balance upon maturity.

7677 Group also executed a security agreement on the same date in which 7677 Group agreed to give FNB "a security interest in all of the Property described in this Agreement" to secure the payment and performance of the Note (the "Security Agreement"). The "Property" described in the security agreement consisted of the following: "Inventory. All inventory which [7677 Group] hold[s] for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in [7677 Group's] business."

Also on February 20, 2010, Gal Batzri, the president of 7677 Group's general partner Joshua Tree, LLC, executed a personal guaranty of the Note (the "Guaranty").

In September 2013, FNB was closed by the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation ("FDIC") was named

receiver.  On November 27, 2013, the FDIC sold, transferred, and assigned the Note and Guaranty to SMS.

On January 27, 2016, SMS sued 7677 Group and Batzri[1] alleging that SMS had become the owner and holder of the Note and the Guaranty, that 7677 Group had defaulted on the Note, and that Batzri had defaulted on the Guaranty.  Batzri moved for summary judgment asserting that SMS's claims against him were barred by limitations.  The trial court granted Batzri's motion for summary judgment and ordered that SMS take nothing on its claims against Batzri.

On January 11, 2021, SMS's claims against 7677 Group were tried to the bench, which rendered a final judgment in favor of SMS.  The following month, 7677 Group requested findings of fact and conclusions of law, moved to modify the final judgment, and moved for a new trial.

On April 12, 2021, the trial court signed a modified final judgment and entered a separate order denying 7677 Group's motion for new trial.  The trial court's modified final judgment awarded SMS $312,576.83 in damages; $389,354.88 in prejudgment interest as of January 11, 2021; additional prejudgment interest at the rate of 17.75% per annum from January 11, 2021 through the date of the judgment; $27,440 in trial attorney's fees, plus a total of $14,500 in conditional appellate

---

[1]     SMS also sued Idan Segev, a limited partner in 7677 Group, who had also executed a personal guaranty of the Note.  Although named as a defendant in the underlying lawsuit, Segev was not served and is not a party to this appeal.

4

attorney's fees; post judgment interest; and court costs. The modified final judgment also ordered that SMS take nothing on its claims against Batzri.

On May 6, 2021, the trial court signed findings of fact and conclusions of law. Thereafter, 7677 Group filed a motion to modify the modified final judgment and a motion for new trial. 7677 Group also filed objections and a request for additional and amended findings of fact and conclusions of law.

The trial court denied 7677 Group's post-judgment motions. 7677 Group timely appealed. And SMS timely cross-appealed.

## 7677 GROUP'S APPEAL

### Standard of Review

In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict. *Thompson v. Smith*, 483 S.W.3d 87, 93 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *HTS Servs., Inc. v. Hallwood Realty Partners*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). When challenged, findings of fact are not conclusive where, as here, there is a complete reporter's record. *Thompson*, 483 S.W.3d at 93; *HTS Servs.*, 190 S.W.3d at 111.

Under these circumstances, the trial court's findings of fact are binding if the evidence supports them. *Thompson*, 483 S.W.3d at 93; *HTS Servs.*, 190 S.W.3d at 111. If the findings are challenged, we review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the

5

legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review, and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822.

In reviewing for factual sufficiency, we consider all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *HTS Servs.*, 190 S.W.3d at 111.[2]

---

[2]  *See also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("It is a familiar principle that in conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the [factfinder]."); *Figueroa v. Davis*, 318 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (observing that factfinder may choose to believe one witness over another).

**Owner and Holder of the Note**

In its first issue, 7677 Group argues that the trial court erred in rendering judgment in favor of SMS because SMS failed to prove that it is the owner and holder of the Note. As such, 7677 Group argues that there is legally and factually insufficient evidence to support the trial court's findings of fact, as well as any implied findings, as follows:

> 2. After the Promissory Note was signed, [FNB] was declared insolvent by the [FDIC], whereupon the [FDIC] became receiver of [FNB] and the owner and holder of the above-described Promissory Note.
>
> 3. The [FDIC] assigned the Promissory Note to [SMS], the latter of whom became and is owner and holder of the Promissory Note.
>
> . . .
>
> 8. The Promissory Note sued upon in this lawsuit requires 7677 Group, L.P. to pay reasonable and necessary attorney's fees incurred by [SMS] incident to any non-payment of the Promissory Note by 7677 Group, L.P.

According to 7677 Group, because there is legally and factually insufficient evidence to support Findings of Fact 2, 3, and 8, the trial court's Conclusions of Law 10, 13, and 14, that 7677 Group breached the Note and is liable to SMS for damages, attorney's fees, and costs, are also erroneous.

**A.    Applicable Law**

To recover on a promissory note, the plaintiff must prove: (1) the existence of the note in question; (2) the defendant signed the note; (3) the plaintiff is the owner

7

or holder of the note; and (4) a certain balance is due and owing on the note. *Wells Fargo Bank, N.A. v. Ballestas*, 355 S.W.3d 187, 191 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

At issue here is the third element—the plaintiff is the owner or holder of the note. The Texas Uniform Commercial Code defines "person entitled to enforce" an instrument as: (i) the holder of the instrument; (ii) a nonholder in possession of the instrument who has the rights of a holder; or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to section 3.309 or 3.418(d). *See* TEX. BUS. & COM. CODE § 3.301; *Manley v. Wachovia Small Bus. Cap.*, 349 S.W.3d 233, 239 (Tex. App.—Dallas 2011, pet. denied). Also, "[a] person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument." TEX. BUS. & COM. CODE § 3.301.

A "holder" is "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." *Id.* § 1.201(b)(21); *Leavings v. Mills*, 175 S.W.3d 301, 309 (Tex. App.—Houston [1st Dist.] 2004, no pet.). When an instrument is payable to an identifiable person, the "holder" is the person in possession if he is the identified person. TEX. BUS. & COM. CODE § 1.201(b)(21); *Leavings*, 175 S.W.3d at 309. A holder of an instrument is a "[p]erson entitled to enforce" an instrument. *Leavings*, 175 S.W.3d at 309.

A person can become the holder of an instrument when the instrument is issued to that person; or he can become a holder by negotiation. *See* TEX. BUS. & COM. CODE § 3.201, U.C.C. cmt. 1. Negotiation is the "transfer of possession of an instrument . . . by a person other than the issuer to a person who thereby becomes its holder." TEX. BUS. & COM. CODE § 3.201(a); *Leavings*, 175 S.W.3d at 309. "[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder." TEX. BUS. & COM. CODE § 3.201(b); *Leavings*, 175 S.W.3d at 309; *Jernigan v. Bank One, Tex., N.A.*, 803 S.W.2d 774, 776 (Tex. App.—Houston [14th Dist.] 1991, no writ). The indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed to it as to become part of it. *Jernigan*, 803 S.W.2d at 776. If an instrument not in the possession of the original holder lacks a written indorsement and proof of the chain of title, the person in possession does not have the status of a holder. *See id.* at 776–77.

A note may be transferred, however, even if it is not indorsed by the transferee; in that case, the transferee acquires whatever rights the transferor had in the note, but he does not become the holder. *See* TEX. BUS. & COM. CODE § 3.201; *Leavings*, 175 S.W.3d at 309. The transfer of title of a negotiable instrument received by the transferee without indorsement includes "such rights as the transferor has therein." *Leavings*, 175 S.W.3d at 309.

Thus, even if a person is not the holder of a note, he may still be able to prove that he is the owner and entitled to enforce the note, foreclose on collateral and obtain a deficiency judgment under common-law principles of assignment. *Id.* A person not identified in a note who is seeking to enforce it as the owner or holder must prove the transfer by which he acquired the note. *Id.*; *Jernigan*, 803 S.W.2d at 777.

**B.     Analysis**

As noted, 7677 Group argues that the trial court erred in rendering judgment in favor of SMS because SMS failed to prove that it is the owner and holder of the Note.  Specifically, 7677 Group argues that although SMS alleged that the FDIC assigned the Note to it after the FDIC became receiver for FNB, SMS presented no evidence at trial of the terms of the receivership or the assets that were included in the receivership.  7677 Group contends that SMS failed to establish that the Note was transferred to it as opposed to PlainsCapital Bank, Dallas, TX—identified in SMS's own exhibit as the "Acquiring Financial Institution."

At trial, SMS introduced Plaintiff's Exhibit 8, which is a printout from the FDIC's website identifing a list of failed banks, including FNB.  Exhibit 8 states that FNB was closed by the Office of the Comptroller of Currency on September 13, 2013, and that the FDIC was appointed receiver.  Although Exhibit 8 identifies "PlainsCapital Bank, Dallas, TX" as the "acquiring financial institution," it states only that "all deposit accounts, including brokered deposits, have been transferred

10

to" PlainsCapital. It also states that the "former [FNB] locations will reopen as branches of PlainsCapital Bank during regular business hours." On the following page, there is a separate section specifically applicable to "loan customers," which states:

> If you had a loan with [FNB], you should continue to make your payments as usual. The terms of your loan will not change, because they are contractually agreed to in your promissory note. Checks should be made payable as usual and sent to the same address until further notice. If you have further questions regarding an existing loan, please contact your loan officer.

> For all questions regarding *new loans and the lending policies of PlainsCapital Bank*, please contact your branch office.

(Emphasis added).

According to 7677 Group, Exhibit 8 does not prove that SMS was the owner or holder of the Note because it contains no information about what assets were included in the FDIC's receivership. Rather, it demonstrates that another institution—PlainsCapital Bank—acquired FNB's assets, including deposit accounts and existing loans. We disagree.

Exhibit 8 demonstrates that only *deposit accounts* were transferred to PlainsCapital, and that new loans, not existing loans, would be handled by PlainsCapital. Existing loan customers were to continue making payments as usual. Further, the exhibit is clear that the FDIC was appointed as receiver in September 2013 after FNB failed.

11

This court previously has held similar evidence that the FDIC was appointed receiver, when combined with an indorsement or other evidence of a transfer from the FDIC in its capacity as receiver for the failed bank to the acquiring bank, is sufficient evidence to establish that the acquiring bank is the holder or owner of the note in question. For example, in *Hinsley v. Bank One*, the appellant executed a note in favor of MBank Houston, N.A. (Mbank). *See Hinsley v. Bank One, Tex., N.A.*, No. 01-90-00829-CV, 1991 WL 94427, at *1 (Tex. App.—Houston [1st Dist.] June 6, 1991, writ denied) (not designated for publication). The note matured on September 1, 1988; however, Hinsley failed to make any payment on the note. *Id.* In March 1989, the Comptroller of Currency declared MBank insolvent and appointed the FDIC as MBank's receiver. *Id.* Thereafter, an order, approving the sale of certain assets and liabilities from the FDIC to the Deposit Bridge Bank, N.A. (Bridge Bank), was entered by a federal district court. *Id.* Subsequently, Bridge Bank legally changed its name to Bank One, Texas, N.A. (Bank One). *Id.* Bank One sued Hinsley, arguing it was the owner and holder of the note. *Id.*

On appeal from a judgment in favor of Bank One, Hinsley argued that Bank One was not entitled to recover on the note because it was neither the payee of the note, nor had the note been indorsed to Bank One. *Id.* The court noted that Bank One was not a holder because the note was not indorsed to it. *Id.* at *2. However, because "a note may be transferred lawfully without an indorsement by the legal

12

owner or holder," the court explained that an individual in possession of a note, payable to the order of a different payee, can enforce payment of the note in his own name by proving the transaction through which the note was acquired. *Id.*

The *Hinsley* court noted that Bank One provided evidence of the (1) original note, (2) purchase and assumption agreement between FDIC and Bridge Bank, and (3) document which changed Bridge Bank's legal name to Bank One. *Id.* Thus, the court held that Bank One established the transaction through which it acquired the note and proved it was an owner. *Id.*

The *Hinsley* court also rejected Hinsley's argument that this documentation was insufficient to prove that Bank One was the owner of the note, because no evidence showed that MBank owned the note when the FDIC was appointed receiver, and no evidence that the FDIC owned the note when it entered into the purchase and assumption agreement with Bridge Bank. *Id.* at *3. The court concluded that the evidence demonstrated that MBank owned the note when the FDIC was appointed receiver, citing to the evidence that the note matured in September 1988, that there were no indorsements on the note, and that in March 1989, the FDIC was appointed receiver. *Id.* Thus, in that case, no further evidence was required to demonstrate the initial transfer between MBank and the FDIC.

In another case, *Winfield v. Dosohs I, Ltd.*, the appellant borrowed from Fidelity National Bank and signed a promissory note. *Winfield v. Dosohs I, Ltd.*, No.

13

01-97-00997-CV, 1998 WL 436895, at *1 (Tex. App.—Houston [1st Dist.] July 30, 1998, no pet.) (not designated for publication). When the note matured in March 1993, appellant was in default. *Id.* After Fidelity National Bank failed, the FDIC was appointed receiver. *Id.* In early 1994, Dosohs bought the promissory note from the FDIC, and the FDIC transferred the note to Dosohs by indorsement. *Id.* Dosohs sued to collect on the note, and the trial court rendered judgment in favor of Dosohs. *Id.*

On appeal, the appellant challenged the trial court's findings that Fidelity National Bank failed and was taken over by the FDIC and that Dosohs was the owner and holder of the promissory note. *Id.* at *3–4. Before the court was evidence of a transfer of liens to Dosohs executed by the FDIC "in its receivership capacity ('Assignor') of Fidelity National Bank," as well as the promissory note that included an indorsement by "Federal Deposit Insurance Corporation, Receiver for: FIDELITY NATIONAL BANK, HOUSTON, TEXAS." *Id.* at *4.

The *Winfield* court concluded this evidence was sufficient to support the finding that the bank failed and was taken over by the FDIC. The court also held that an allonge from the FDIC to Dosohs was valid and established that it was the holder of the note. *Id.* at *4–5.[3]

---

[3]     *See also Catalina v. Cramer Fin. Grp., Inc.*, No. 01-96-00862-CV, 1998 WL 135120, at *10 (Tex. App.—Houston [1st Dist.] Mar. 19, 1998, no pet.) (not designated for publication) (holding evidence established that Cramer was owner of

14

Like the acquiring institutions in the above-cited cases, SMS also introduced evidence as to how it had acquired the Note. SMS introduced a the Note, which matured in February 2011, as Exhibit 3. Benjamin Myers, SMS's representative and custodian of records, testified that SMS received the Note as part of the 398 pages of business records it received directly from the FDIC. Myers testified that SMS was the owner and holder of the Note.

Although the Note itself did not contain any indorsements, the trial court admitted SMS's Exhibit 2, an "Allonge to Promissory Note," ("Allonge"). It specifically identified the Note and contained the following indorsement:

> Pay to the order of SMS Financial JDC, L.P., a Delaware limited partnership, whose address is 6829 North 12th Street, Phoenix, AZ 85014.
>
> WITHOUT RECOURSE and without representation or warranty except as set forth in that certain Limited Partnership Agreement dated February 27, 2012.
>
> BY SMS Financial JDC, L.P., under Power of Attorney from the Federal Deposit Insurance Corporation, as Receiver for First National Bank, 100 W. Cano, Edinburg, TX 78539.

The Allonge identified the "[FDIC] as Receiver for [FNB]" as the assignor and was signed by "Jonathan Hoffer – Attorney-in-Fact."

---

note because note was indorsed from FDIC, in its capacity as receiver for MBank Houston, to Bank One; testimony was presented that Bank One was surviving entity of MBank, Bank One purchased all assets of MBank, and Cramer purchased interests from Bank One; and two assignments showed FDIC, as receiver for MBank, assigned note to Bank One, and that Bank One assigned note to Cramer).

The trial court here also admitted SMS's Exhibit 7, a limited power of attorney signed by the FDIC on March 19, 2014, designating "Jonathan Hoffer of SMS Financial CBS, LLC, to act on behalf of the FDIC in any of its Receivership . . . capacities related to multiple failed financial institutions," and authorizing the attorney-in-fact "[t]o execute, acknowledge, seal and deliver on behalf of the FDIC . . . any and all instruments of transfer and conveyance, appropriately completed, with all ordinary and necessary endorsements, acknowledgements, affidavits and supporting documents as may be necessary or appropriate to evidence the sale and transfer of any asset . . . ."

Finally, the trial court admitted into evidence SMS's Exhibit 6, entitled "Assignment of Loan Documents and Related Rights" ("Assignment"). The Assignment states: "The [FDIC], as Receiver for [FNB] ('Assignor'), by and through its attorney in fact undersigned, hereby assigns to SMS Financial JDC, LP. ('Assignee'), all rights, title and interest in the loan documents identified on the attached Exhibit A." Exhibit A identifies the Note, the Security Agreement, and the Guaranty as the loan documents subject to the Assignment. The Assignment is signed by Hoffer in his capacity as attorney-in-fact for the "Assignor: [FDIC] as Receiver for [FNB]."

The above evidence demonstrates that SMS is in possession of the Note, which, in the Allonge, is indorsed by the FDIC in its capacity as receiver for FNB to

16

SMS. Further, in its capacity as receiver for FNB, the FDIC assigned the Note to SMS.

Accordingly, we hold that the evidence that the FDIC was appointed receiver of FNB, along with the Note, the Allonge, the Assignment, and Myers's testimony establishes that SMS is indeed the owner and holder of the Note.[4] *See Winfield*, 1998 WL 436895, at *3–5; *Catalina*, 1998 WL 135120, at *10; *Hinsley*, 1991 WL 94427, at *2–3.

## C.     Admissibility of Exhibits 2 and 6

7677 Group also argues that the trial court erred in admitting into evidence the purported transfer documents: (1) Exhibit 2, the Allonge and (2) Exhibit 6, the Assignment, and therefore these exhibits are insufficient to support the trial court's findings. According to 7677 Group, SMS failed to establish the necessary predicate for admission of these documents as required by Texas Rule of Evidence 803(6) because Myers never testified that (1) the information in these exhibits were placed

---

[4]     We find *Geiselman v. Cramer Financial Group, Inc.*, 965 S.W.2d 532, 538 (Tex. App.—Houston [14th Dist.] 1997, no writ), cited by 7677 Group, distinguishable. In that case, the court held that a summary judgment affidavit was insufficient to prove that the acquiring bank was the owner of notes because although a vice president testified that the FDIC was appointed receiver of the failed bank and became the rightful owner of notes, he stated no facts indicating he personally knew the notes were among the assets of the failed bank. As noted, that case was on summary judgment, not following a bench trial and it was undisputed that the acquiring bank did not have possession of the original notes, as it claimed they had been lost, stolen, or destroyed.

there at or near the time by a person with knowledge of that information, (2) the information in these exhibits were kept in the ordinary course of business, or (3) it was the regular practice of that business activity to make those records. *See* TEX. R. EVID. 803(6).[5]

At trial, 7677 Group objected to Exhibit 2 because it was "conclusory and hearsay." Specifically, 7677 Group argued that the exhibit referenced an assignment to SMS and a partnership agreement, neither of which had been produced in discovery. 7677 Group made a similar objection to Exhibit 6, arguing that the exhibit was conclusory because it "relies on an agreement that's not in evidence,"

---

[5]    Rule 803(6) provides that certain records are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness, if:

    (A)    the record was made at or near the time by—-or from information transmitted by—someone with knowledge;

    (B)    the record was kept in the course of a regularly conducted business activity;

    (C)    making the record was a regular practice of that activity;

    (D)    all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

    (E)    the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. "Business" as used in this paragraph includes every kind of regular organized activity whether conducted for profit or not.

TEX. R. EVID. 803(6).

and that it contained statements about the limited partnership which were "certainly hearsay." 7677 Group did not, however, object to these two exhibits on the basis that SMS failed to establish the necessary predicate for the admission of business records under Rule 803(6).[6]

To preserve a complaint for appellate review, a party must state an objection clearly and with sufficient specificity to make the trial court aware of the particular grounds for the complaint. TEX. R. APP. P. 33.1(a). Further, an appellant's complaint on appeal must comport with her objection in the trial court. *Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). "[A] general hearsay objection does not preserve for appeal a challenge to a proper predicate's being made to admit business records."[7] *Rogers v. Dep't of Family & Protective*

---

[6]     We acknowledge that 7677 Group made Rule 803(6) objections, among others, in reference to SMS's Exhibit 1, which consisted of Myers's business records affidavit and the 398 pages of business records SMS received from the FDIC. Included in those business records were the Allonge and the Assignment. The trial court granted 7677 Group's objections and excluded Exhibit 1. 7677 Group, however, did not reiterate these same Rule 803(6) objections when SMS moved to admit into evidence the Allonge (Exhibit 2) and the Assignment (Exhibit 6) as separate standalone exhibits.

[7]     *See also Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *6 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (holding general hearsay objection did not preserve for appeal challenge to predicate being made to admit business records); *In re N.C.M.*, 66 S.W.3d 417, 420 (Tex. App.—Tyler 2001, no pet.) (holding that general hearsay objection to business records was insufficient to inform trial court of specific grounds of objection or to preserve error); *Clark v. Walker–Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that objection to personal knowledge of sponsoring witness to assert business records

19

*Servs.*, 175 S.W.3d 370, 376 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.).

Because 7677 Group's conclusory and hearsay objections to Exhibits 2 and 6 do not comport with the objection it makes on appeal, we hold that this argument is not preserved for our review. *See Benson*, 536 S.W.3d at 895.

7677 Group also argues that these documents are internally inconsistent and are therefore unreliable. It argues that the Allonge states the Note was "sold, transferred and assigned" to SMS on November 27, 2013, but the Assignment purports to assign the Note to SMS almost two years later, on December 10, 2015. According to 7677 Group, the Assignment also contradicts the Allonge in that it states "immediately prior to making this Agreement [the FDIC] was the sole owner of the [FDIC]'s interest in the documents and rights assigned hereby, or the fully authorized agent of all such parties," but the Allonge states that the FDIC had not been the owner of the Note since late 2013. Due to these purported contradictions, 7677 Group contends that the Allonge and Assignment cannot be reconciled and are unreliable and insufficient to support a judgment in favor of SMS.

We disagree. Any alleged contradictory nature of the exhibits was explained by Myers's testimony describing the transfer of the Note from the FDIC to SMS.

exception to hearsay rule did not preserve error asserted on appeal that invoices were not generated at or near time of transaction and that appellee failed to lay proper predicate for introduction of summary of business records).

20

Myers testified that SMS acquired the Note from the FDIC on November 27, 2013, but that the Assignment and Allonge were not executed until 2015. Myers explained that SMS acquired over 500 assets from the FDIC and prepared the necessary documents after the acquisition. Myers testified that due to the number of assets acquired, SMS was not able to get to all of them on the same date.

Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings that SMS was the owner and holder of the Note.

We overrule 7677 Group's first issue.

## Damages

In its second issue, 7677 Group argues that the trial court reversibly erred in awarding damages and other relief to SMS, because the uncontroverted evidence demonstrates that 7677 Group was not given credit for all payments made on the Note or for the value of the collateral pledged to FNB and subsequently taken by FNB. Accordingly, 7677 Group argues factually insufficient evidence support the trial court's findings of fact as follows:

4. 7677 GROUP, L.P. defaulted on the Promissory Note by failing to pay all principal and accrued interest payments required by the February 20, 2011 maturity date and continuing through the completion of trial in this lawsuit.

. . .

6. As of January 11, 2021, $312,576.83 in unpaid principal and $389,354.88 in accrued yet unpaid interest is owed on the Promissory Note is owed, and additional daily interest of

21

$152.00 (17.75% per annum) will accrue until the date of Final Judgment in this lawsuit.

7. 7677 GROUP, L.P. offered insufficient evidence at trial to establish any offsets against the principal and interest amounts found in the preceding paragraph.

Considering all of the evidence supporting and contradicting the findings, as we must, we agree with 7677 Group that the trial court's findings 6 and 7 related to the amount owed on the Note, including any applicable offsets, are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Plas–Tex, Inc.*, 772 S.W.2d at 445; *Cain*, 709 S.W.2d at 176.

Only one piece of evidence supports the trial court's finding that, as of January 11, 2021, the unpaid principal balance on the Note was $312,576.83—Myers's testimony. When asked what SMS was asking for on the Note, Myers responded that the "outstanding principal balance is $312,576.83." Myers testified that he compared the $312,576.83 principal balance against the payment history offered by 7677 Group and observed that the principal balances were "very close and that most of the payments that they suggest that they made are reflected in the payment history that we have." Although SMS attempted to introduce evidence of its records of the payment history on the Note, the trial court excluded that evidence.

In contrast, 7677 Group presented testimony and documentary evidence that 7677 Group made several payments to FNB before the FDIC's receivership and assignment of the Note to SMS that were not considered by SMS in its calculation

22

of the amount due on the Note.  For instance, the trial court admitted 7677 Group's Exhibit 3, which consisted of vendor reports for the years 2009, 2010, and 2011 documenting the payment history for the "[FNB] LOC."

Batzri testified that Exhibit 3 reflected part of the payment history on the Note. He testified that the payment history and balance sheets in Exhibit 3 were prepared by someone in 7677 Group, that the entries were prepared as they were made, and that he had custody of those business records as President for 7677 Group's general partner, Joshua Tree, LLC.

Exhibit 3 also indicates that the 2010 ending balance on the Note was $309,551.40.  It reflects that two payments were made in January 2011, before maturity, which brought the balance due down to $305,251.41.  The exhibit also reflects four payments made in 2011 after maturity:

- $2,000 payment on February 25, 2011,

- $45,000 payment on April 15, 2011,

- $99,625 payment on July 27, 2011, and

- $110,925.85 payment on August 2, 2011.

In support of that exhibit, Batzri testified that a payment of $45,000 was made on or about April 15, 2011, and that FNB took this payment from his personal savings account at FNB.

Batzri also testified that a payment of $99,625 was made on or about July 27, 2011. He explained that the source of that payment was the sale of 27 vehicles that were pledged to FNB as collateral for the Note. Batzri testified that FNB had possession of the titles to those vehicles, and that FNB released the titles so the vehicles could be sold to fund the $99,625 payment.

Additionally, the trial court admitted 7677 Group's Exhibit 4, which included an email from Eddie Dan, CFO of 7677 Group, to Batzri stating:

> See list below. [T]his is the final number [I] managed to negotiate with the buyer for the bulk purchase of all the cars.
>
> I have already spoke[n] to Chris from FNB and he would release all the titles for this amount. [H]e will work with me on this transaction and we will get it done.

Below the text of this email is a list of 27 vehicles, including make, model, and title number, and a corresponding sale price. The total proceeds from the sale of all 27 vehicles was listed as $99,625. Batzri also testified that he physically saw FNB sign off on the titles and that he, as seller, also signed off on the titles when the vehicles were sold to a buyer. He testified that the funds received from the sale of those vehicles were sent to FNB as payment on the Note. And that this $99,625 payment was "supposed to be credited to [the] 7677 line of credit, [but] they were not credited on the account."

Batzri further testified that a payment of $110,925.85 was made on or about August 2, 2011, and that he received confirmation from Idan Segev, a limited partner

24

in 7677 Group and the person who made the payment, that the payment was made. As evidence of this payment, the trial court admitted 7677 Group's Exhibit 6, an email from Segev, stating: "Gal, [I] made the wire to FNB. [W]ith currency exchange rate and the fees the net wire is $110,925.85." The subject line of this email is "Re: Payment FNB LOC."

Finally, Batzri testified that if 7677 Group had received credit for these six payments made in 2011, the outstanding principal balance owed to FNB as of December 31, 2011, was $47,700.55. Exhibit 3 likewise reflects that the 2011 ending balance was $47,700.55. Batzri stated that SMS's calculations of the indebtedness owed by 7677 Group on the Note failed to give 7677 Group "the proper credit" for any of those six payments.

Although there is some evidence (in the form of Myers's testimony) supporting the trial court's finding of an unpaid principal balance of $312,576.83, the evidence supporting this finding is overwhelmingly outweighed by the evidence reflecting that at least some payments were made to the Note before and after maturity that were not accounted for by SMS in its calculation. Accordingly, having examined all the relevant evidence, we hold that the trial court's findings 6 and 7 related to the amount of unpaid principal balance and offsets are not supported by factually sufficient evidence.

We hold, however, that the trial court's finding 4—i.e., 7677 Group defaulted on Note by failing to pay all principal and accrued interest payments required by the February 20, 2011 maturity date and continuing through the completion of trial in this lawsuit—is supported by factually sufficient evidence.

As discussed above, even considering the evidence of the six payments made by 7677 Group before and after maturity, 7677 Group admitted at trial that the remaining balance owed on the Note at the end of 2011, after maturity, was $47,700.55.

7677 Group, however, contends that in addition to making these six unaccounted for payments, in 2012, FNB agreed to take possession of nearly $2,000,000 in collateral pledged on 7677 Group's behalf pursuant to the Security Agreement, thereby satisfying all its obligations under the Note. According to 7677 Group, the collateral securing the Note consisted of two CDs with an approximate value of $150,000 and cosmetics inventory of a separate entity, Soapranos NC Products. Inc., with an approximate retail value of $1.7 million.

Batzri testified that in the beginning of 2012, he had a conversation with "Chris" at FNB and Chris was "impatient to get payment." He testified that FNB "had the inventory of So[a]pranos as collateral," and that FNB "pressed to get the payment [on the Note]" and "wanted t[he] collateral . . . to pay off the debt

completely." Batzri testified that he told Chris he was not able to sell the inventory as fast as the bank wanted, and so he offered FNB the collateral and FNB accepted.

We agree with SMS that this evidence related to FNB's alleged acceptance of this collateral in satisfaction of 7677 Group's obligations under the Note is barred by federal law, specifically, *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447 (1942) and 12 U.S.C. § 1823(e).

When the FDIC acts as a receiver for a failed bank, the *D'Oench, Duhme* doctrine bars the use of an unrecorded agreement between a borrower and the failed bank as a basis for defenses or claims against the FDIC or its assigns. 315 U.S. at 453–62; *Bluebonnet Sav. Bank v. Jones Country, Inc.*, 920 S.W.2d 670, 671 (Tex. 1996) (per curiam).

Section 1823(e) partially codified the *D'Oench, Dhume* doctrine that no agreement which tends to diminish or defeat the interest of the FDIC in any asset acquired by it shall be valid against the FDIC unless it: (A) is in writing; (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution; (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been, continuously, from the time of its execution, an official record of the depository institution. 12 U.S.C. § 1823(e).

27

The policies behind this doctrine are to: (1) allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets, which are necessary when a bank is examined for fiscal soundness, deciding whether to liquidate the failed bank, or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, and (2) ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of banks employees, when a bank appears headed for failure. *See Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 91–92 (1987).

7677 Group argues that the *D'Oench, Duhme* doctrine and Section 1823 do not apply here because there is no secret agreement. Rather, according to 7677 Group, FNB took possession of the collateral, including the CDs and the Sopranos cosmetics inventory, pursuant to a written agreement referenced in and executed at the same time as the Note, i.e., the Security Agreement.

While it is true that the Security Agreement was executed at the same time as and specifically references the Note, the Security Agreement gave FNB "a security interest in all of the Property described in this Agreement" to secure the payment and performance of the Note. The "Property" described in the security agreement consisted of the following: "Inventory. All inventory which [7677 Group] hold[s] for ultimate sale or lease, or which has been or will be supplied under contracts of

28

service, or which are raw materials, work in process, or materials used or consumed in [7677 Group's] business."

Nothing in the Security Agreement indicates that the CDs were additional collateral or security, or that they fell within the definition of "inventory." The same is true for Soapranos's cosmetics inventory. The Security Agreement was executed by 7677 Group, not Soapranos, and there is no indication that 7677 Group's "inventory," as defined in the Security Agreement, included the inventory of a separate entity.

Accordingly, any evidence of a side agreement or conversations that 7677 Group had with FNB whereby FNB agreed to accept the CDs or cosmetics inventory of another entity as collateral, even though those items were not specifically referenced in the Security Agreement, is the type of evidence *D'Oench, Dhume* and Section 1823 are meant to address. *See Fed. Deposit Ins. Corp. v. Projects Am. Corp.*, 828 S.W.2d 771, 773 (Tex. App.—Texarkana 1992, writ denied) (holding evidence of side agreement that collateral not specifically identified in note was intended to be security for note was barred by *D'Oench, Dhume* doctrine and section 1832(e)).[8]

---

[8] *See also Cintra Antiques, Inc. v. Bank One, Tex., N.A.*, No. 05-91-00484-CV, 1992 WL 13974, at *4 (Tex. App.—Dallas Jan. 29, 1992, no writ) (not designated for publication) (holding evidence of letter agreement providing for liquidation of inventory and assets of debtor as part of accord and satisfaction of debt due to Bank One and other "understandings" that Bank One would apply proceeds to satisfy

Because the only evidence before the trial court that the Note had been fully satisfied by the time of trial consisted of Batzri's testimony related to FNB's acceptance of the collateral, which is barred by federal law, the overwhelming weight of the evidence supports the conclusion that at least some amount was owed on the Note as of maturity and the completion of trial—and, therefore, 7677 Group was in default. As a result, is the record contains factually sufficient evidence to support the trial court's finding of fact 4.

In sum, we hold that the record contains factually sufficient evidence to support the trial court's finding of fact 4, that 7677 Group defaulted on the Promissory Note by failing to pay all principal and accrued interest payments required by the February 20, 2011 maturity date and continuing through the completion of trial in this lawsuit. We further hold, however, that the trial court's findings of fact 6 and 7 are not supported by factually sufficient evidence. Accordingly, 7677 Group is entitled to a new trial on damages only.[9]

---

outstanding debt was type of oral agreements barred by *D'Oench Dhume* where letter agreement was not in bank records).

[9] *See In re N. Nat. Gas Co.*, 327 S.W.3d 181, 187 (Tex. App.—San Antonio 2010, orig. proceeding [mand. denied]) (holding that balance on promissory note is liquidated damage and reversing and remanding for new trial on damages without requiring new trial on liability); *Watson v. Sheppard Fed. Credit Union*, 589 S.W.2d 742, 744 (Tex. App.—Fort Worth 1979, writ ref'd n.r.e.) (citing *Dallas Cnty. State Bank v. Thiess*, 575 S.W.2d 20, 21 (Tex. 1978) (holding, in default judgment context, that difference between amount of indebtedness alleged to be due and face amount of note does not create ambiguity or raise issue of fact regarding payments credited, and therefore, allegation of indebtedness in pleadings was liquidated

We sustain in part and overrule in part 7677 Group's second issue.[10]

## SMS'S CROSS APPEAL

## Statute of Limitations Applicable to Guaranty Agreement

In its sole issue in its cross appeal, SMS argues that the trial court incorrectly granted summary judgment in favor of Batzri on limitations grounds. Batzri moved for traditional summary judgment, arguing that the Texas four-year statute of limitations in Texas Civil Practices & Remedies Code section 16.004(a), applied to SMS's suit on the Guaranty. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a)(3) ("A person must bring suit on the following actions not later than four years after the day the cause of action accrues . . . debt."). The trial court granted Batzri's motion for summary judgment and, in the modified final judgment, ordered that SMS take nothing on its claims against Batzri.

SMS argues on appeal, and in its summary judgment response below, that the federal six-year statute of limitations in 12 U.S.C. Section 1821(d)(14) applies to any contract claim, including a suit on a guaranty and therefore SMS, as an assignee of the FDIC, is entitled to avail itself of the six-year limitations period. According

demand); *cf.* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").

[10] Because we reverse and remand for a new trial on damages, we likewise reverse the award of attorney's fees and prejudgment interest. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 545 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Therefore, we do not address 7677 Group's substantive arguments related to those awards in its second and third issues. *See* TEX. R. APP. P. 47.1.

to SMS, its suit against Batzri, which was brought within five years of the maturity of the Note, was timely and summary judgment was improper.  We agree.

## A.    Standard of Review

We review a trial court's ruling on a traditional motion for summary judgment de novo. *Valance Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).  A traditional motion for summary judgment is properly granted when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law on the grounds expressly set forth in the motion. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005).  When reviewing an order granting a traditional motion for summary judgment, we must take evidence favorable to the nonmovant as true and indulge every reasonable inference from the evidence in favor of the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997).

## B.    Analysis

As the movant for summary judgment, Batzri had the burden of showing there was no genuine issue of material fact and that he was entitled to judgment as a matter of law. *Id.*  The facts were not disputed; therefore, we must determine whether, on the basis of those facts, limitations barred Batzri's suit.

The parties do not dispute that SMS's cause of action on the Guaranty accrued upon the maturity of the Note, February 20, 2011.  Thus, the four-year statute of limitations in section 16.004 of the Civil Practice and Remedies Code, if applicable,

32

expired on February 20, 2015. Because SMS did not file suit against Batzri until January 27, 2016, its suit is barred if it falls under section 16.004.

SMS argues that section 16.004 does not apply and that its cause of action is governed by the six-year statute of limitations applicable to the FDIC found in Section 1821(d)(14) of the United States Code. If Section 1821(d)(14) applies, the statute of limitations on SMS's cause of action against Batzri would not have expired until February 20, 2017, and SMS's suit filed on January 27, 2016 would have been timely filed.

Section 1821(d)(14) provides:

**(A) In general**

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i)    in the case of any contract claim, the longer of—

(I)    the 6–year period beginning on the date the claim accrues; or

(II)    the period applicable under State law . . .

**(B) Determination of the date on which a claim accrues**

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i)    the date of the appointment of the Corporation as conservator or receiver; or

(ii)    the date on which the cause of action accrues.

12 U.S.C. § 1821(d)(14)(A), (B).

This provision was enacted as part of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). The Texas Supreme Court has noted that FIRREA does not expressly extend the benefit of this expanded limitations period to the FDIC's successors in interest. *See Jackson v. Thweatt*, 883 S.W.2d 171, 173–74 (Tex. 1994). But the court concluded that the "FDIC's successors in interest are entitled to the benefits of section 1821(d)(14) pursuant to the common law maxim that an assignee stands in the shoes of his assignor." *Id.* at 174 (quotations omitted). The court in *Jackson* further explained that "[i]f the FDIC's statute of limitations did not enure to the benefit of its transferees, the market value of notes and other assets in the hands of the FDIC would be diminished," hindering one of FIRREA's statutory purposes to "provide funds from public and private sources to deal expeditiously with failed depository institutions." *Id.* Accordingly, the court held that "section 1821(d)(14) applies to actions brought by purchasers of assets from the FDIC to recover on those purchased assets . . . ." *Id.* at 178.

*Jackson* involved a suit on a promissory note brought by an assignee of the FDIC against the debtor. In an opinion issued on the same day as *Jackson*, the Texas Supreme Court applied the reasoning of *Jackson* to a suit on a guaranty. *See EKA Liquidators v. Phillips*, 883 S.W.2d 178, 178–79 (Tex. 1994). The court explained as follows:

34

This case presents the question resolved today in *Jackson v. Thweatt*, 883 S.W.2d 171 (Tex. 1994). Because the decision of the court of appeals, 883 S.W.2d 218, conflicts with our holding in *Jackson*, we reverse the judgment of the court below and remand the cause to the trial court for further proceedings.

Troy Phillips guaranteed two notes payable to the Heritage National Bank maturing in August 1986 and June 1987, respectively. The notes went into default on maturity, obligating Phillips on his guaranty. The FDIC acquired the notes as receiver for Heritage National Bank in September 1986, later assigning them to EKA Liquidators ("EKA"). After EKA brought suit on the notes in August 1991, Phillips moved for summary judgment based on the Texas four year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE § 16.004. The trial court granted summary judgment for EKA, and the court of appeals affirmed, concluding that assignees of promissory notes from the FDIC are not entitled to the benefit of the six year limitations period applicable to the FDIC. *See* 12 U.S.C. § 1821(d)(14).

We held today in *Jackson* that an assignee of a promissory note from the FDIC does receive the benefit of the special limitations provision set forth in section 1821(d)(14). Accordingly, without hearing oral argument, a majority of the Court reverses the judgment of the court of appeals and remands the cause to the trial court for further proceedings.

*Id.*[11]

Batzri acknowledges the opinions in *Jackson* and *EKA Liquidators*, but argues, in essence, that these cases were wrongly decided in that they "improperly

---

[11]  *See also U.S. Loan Liquidators I, Ltd v. Pate*, No. 14-96-00591-CV, 1997 WL 251346, at *4 (Tex. App.—Houston [14th Dist.] May 15, 1997, pet. denied) (not designated for publication) (citing *Jackson v. Thweatt*, 883 S.W.2d 171 (Tex. 1994), and *EKA Liquidators v. Phillips*, 883 S.W.2d 178 (Tex. 1994), and holding that six-year statute of limitations in 12 U.S.C. § 1821(d)(14) applied to suit on guaranty); *cf. Barnes v. LPP Mortg., Ltd.*, 358 S.W.3d 301, 305 (Tex. App.—Dallas 2011, pet. denied) (citing *Jackson and EKA Liquidators* and holding that similar six-year statute of limitations in 28 U.S.C. § 2415(a) applied to assignees of Small Business Administration in suit on guaranty).

elevate a common-law rule over statutes," and therefore, we should not follow them. It is not the function of a court of appeals to abrogate or modify established precedent. *Lubbock Cnty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002). Rather, as an intermediate appellate court, we are bound by existing Texas Supreme Court authority. *Harris Cnty. Fresh Water Supply Dist. No. 61 v. Magellan Pipeline Co.*, 649 S.W.3d 630, 648 (Tex. App.—Houston [1st Dist.] 2022, pet. denied).

Being bound by the Texas Supreme Court's decisions in *Jackson* and *EKA Liquidators*, we hold that the six-year statute of limitations in 12 U.S.C. Section 1821(d)(14) applies to SMS's claims against Batzri on the Guaranty. Accordingly, the trial court erred in granting Batzri's motion for summary judgment on limitations grounds and rendering a take-nothing judgment against SMS on its claims against Batzri based on the Guaranty.

We sustain SMS's sole issue on cross appeal.

## Conclusion

We reverse the trial court's judgment against 7677 Group as to damages, attorney's fees, and prejudgment interest. We remand for a new trial as to damages, attorney's fees, and for a recalculation of prejudgment interest. We reverse the trial court's take-nothing judgment against Batzri and reverse and remand for further proceedings. We affirm the judgment in all other respects.


Terry Adams
Chief Justice


Panel consists of Chief Justice Adams and Justices Hightower and Countiss.